**No. 24-1945**

_____

The United States Court of Appeals
for the Seventh Circuit

CALVIN D. LEE,
*Plaintiff-Appellant,*
v.

MILWAUKEE COUNTY, WISCONSIN,
*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin
Case No. 22-CV-01089
Magistrate Judge William E. Duffin

**RESPONSE BRIEF OF DEFENDANT-APPELLEE
MILWAUKEE COUNTY, WISCONSIN**

SAMUEL C. HALL, JR.
WI State Bar No. 1045476
Counsel of Record
SARA C. MILLS
WI State Bar No. 1029470
MICAELA E. HAGGENJOS
WI State Bar No. 1118840
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendant-Appellee,
Milwaukee County, Wisconsin
710 N. Plankinton Avenue, Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
SHall@CrivelloLaw.com
SMills@CrivelloLaw.com
MHaggenjos@CrivelloLaw.com

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Appellee furnishes the following list in compliance with Circuit Rule 26.1:

1.  The full name of every party the attorneys represent in this case:

    Milwaukee County.

2.  The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

    Milwaukee County Office of Corporation Counsel and Crivello, Nichols & Hall, S.C.[1] represent Defendant-Appellee Milwaukee County.

3.  Any parent corporation and any publicly held company that own 10% or more of stock or shares:

    Not Applicable—Defendant-Appellee Milwaukee County was and is a municipal corporation.

<div style="text-align:right">

s/ Samuel C. Hall
SAMUEL C. HALL, JR.
WI State Bar No. 1045476
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendant-Appellee,
Milwaukee County, Wisconsin
710 N. Plankinton Avenue, Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
SHall@CrivelloLaw.com

</div>

---

[1] The name of counsel's law firm recently changed from Crivello Carlson, S.C. to Crivello, Nichols & Hall, S.C. However, the law firm is the same firm and the counsel appearing for Defendant-Appellee has remained the same throughout the duration of the litigation.

1

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellee furnishes the following list in compliance with Circuit Rule 26.1:

1.  The full name of every party the attorneys represent in this case:

    Milwaukee County.

2.  The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

    Milwaukee County Office of Corporation Counsel and Crivello, Nichols & Hall, S.C.[2] represent Defendant-Appellee Milwaukee County.

3.  Any parent corporation and any publicly held company that own 10% or more of stock or shares:

    Not Applicable—Defendant-Appellee Milwaukee County was and is a municipal corporation.

> s/ Sara C. Mills
> SARA C. MILLS
> WI State Bar No. 1029470
> CRIVELLO, NICHOLS & HALL, S.C.
> Attorneys for Defendant-Appellee,
> Milwaukee County, Wisconsin
> 710 N. Plankinton Avenue, Suite 500
> Milwaukee, Wisconsin 53203
> Phone: 414-271-7722
> SMills@CrivelloLaw.com

---

[2] The name of counsel's law firm recently changed from Crivello Carlson, S.C. to Crivello, Nichols & Hall, S.C. However, the law firm is the same firm and the counsel appearing for Defendant-Appellee has remained the same throughout the duration of the litigation.

2

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellee furnishes the following list in compliance with Circuit Rule 26.1:

4.  The full name of every party the attorneys represent in this case:

Milwaukee County.

5.  The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this court:

Milwaukee County Office of Corporation Counsel and Crivello, Nichols & Hall, S.C.[3] represent Defendant-Appellee Milwaukee County.

6.  Any parent corporation and any publicly held company that own 10% or more of stock or shares:

Not Applicable—Defendant-Appellee Milwaukee County was and is a municipal corporation.

s/ Micaela Haggenjos
MICAELA E. HAGGENJOS
WI State Bar No. 1118840
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendant-Appellee,
Milwaukee County, Wisconsin
710 N. Plankinton Avenue, Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
MHaggenjos@CrivelloLaw.com

---

[3] The name of counsel's law firm recently changed from Crivello Carlson, S.C. to Crivello, Nichols & Hall, S.C. However, the law firm is the same firm and the counsel appearing for Defendant-Appellee has remained the same throughout the duration of the litigation.

# TABLE OF CONTENTS

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ....................................1

TABLE OF CONTENTS ........................................................................4

JURISDICTIONAL STATEMENT..........................................................11

STATEMENT OF THE ISSUES…………………………………………..12

STATEMENT OF THE CASE ...............................................................13

I.      Relevant Facts .........................................................................13

    A.  Background ....................................................................13

    B.  MCJ's COVID-Related Policies and Procedures .........13

    C.  MCJ's Health Care-Related Policies and Procedures...15

    D.  MCJ's COVID-Related Policies and Procedures .........17

II.     Procedural History...................................................................21

SUMMARY OF THE ARGUMENT..........................................................25

STANDARD OF REVIEW......................................................................27

ARGUMENT.........................................................................................28

I.      Lee Failed to Demonstrate That Any Milwaukee County Policy Caused a Constitutional Deprivation Related to his Medical or Mental Health Care....................................................................29

    A.  Lee Did Not Receive Objectively Unreasonable Medical Care...30

    B.  Lee Failed to Establish that Milwaukee County had Notice of Any Unconstitutional Conduct Caused by its Policies.........................36

II. Lee Failed to Demonstrate That Any Milwaukee County Policy Related to COVID-19 Caused a Constitutional Deprivation. .............40

III. Lee Failed to Show That Any Milwaukee County Policy Related to his Conditions of Confinement Caused a Deprivation of his Constitutional Rights. ...........................................................................46

    A. Lee's General Complaints About the Cleanliness of MCJ Fail as a Matter of Law. ...............................................................................49

    B. Lee Failed to Show that Any Specific Condition at MCJ was Objectively Serious or was Directly Caused by any Milwaukee County Policy or Practice. ..........................................................51

III. Lee's Other Arguments Must be Disregarded Because They Were Not Raised in the District Court and/or Were Specifically Dismissed in the Screening Orders .................................................................................46

CONCLUSION...............................................................................................58

CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g), FRAP RULE 32(c) ................................................................60

PROOF OF SERVICE...................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................27

*Antonelli v. Sheahan*,
81 F.3d 1422 (7th Cir. 1996) ...........................................................49, 55

*Archie v. City of Racine*,
874 F.2d 1211 (7th Cir. 1988) .................................................................43

*Bell v. Wolfish*,
441 U.S. 520 (1979)..................................................................................47

*Board v. Farnham*,
394 F.3d 469 (7th Cir. 2005) ...........................................................49, 55

*Burks v. Raemisch*,
555 F.3d 592 (7th Cir. 2009) ...................................................................31

*Caldwell v. Woock*,
18-cv-1074, 2023 WL 3582349 (W.D. Wis. 2023)....................................47, 48

*Cosby v. Ward*,
843 F.2d 967 (7th Cir. 1988) ...................................................................29

*Daniel v. Cook County*,
833 F.3d 728 (7th Cir. 2016) .....................................................37, 40, 56

*Dean v. Wexford Health Sources, Inc.*,
18 F.4th 214 (7th Cir. 2021) ......................................................28, 36, 37

*Farmer v. Brennan*,
511 U.S. 825 (1994)..................................................................................47

*Figgs v. Dawson*,
829 F.3d 895 (7th Cir. 2016) ...................................................................37

*Gasaway v. Vigo County Sheriff's Dep't*,
672 F.Supp.3d 651 (S.D. Ind. 2023)..........................................................40, 41

*George v. Smith*,
   507 F.3d 605 (7th Cir. 2007) ...................................................................................57

*Giles v. Godinez*,
   914 F.3d 1040 (7th Cir. 2019) .................................................................................41

*Grieveson v. Anderson*,
   538 F.3d 763 (7th Cir. 2008) ...................................................................................57

*Hahn v. Walsh*,
   762 F.3d 617 (7th Cir. 2024) ...................................................................................29

*Hardeman v. Curran*,
   933 F.3d 816 (7th Cir. 2019) ...................................................................46, 48, 56

*Harper v. Santos*,
   847 F.3d 923 (7th Cir. 2017) ...................................................................................36

*Harris v. Fleming*,
   839 F.2d 1232 (7th Cir. 1988) .................................................................................48

*Heien v. North Carolina*,
   574 U.S. 54 (2014).....................................................................................................41

*Howell v. Wexford Health Sources, Inc.*,
   987 F.3d 647 (7th Cir. 2021) ...................................................................................28

*Isby v. Clark*,
   100 F.3d 502 (7th Cir. 1996) ...................................................................................51

*Jackson v. Duran*,
   15-cv-1846, 2017 WL 8217063 (N.D. Ill. Dec. 14, 2017) ................................49

*J.K.J. v. Polk County*,
   960 F.3d 367 (7th Cir. 2020) ...................................................................................50

*Johnson v. Doughtry*,
   433 F.3d 1001 (7th Cir. 2006) .................................................................................36

*King v. Henricks County Comm'r*,
   954 F.3d 981 (7th Cir. 2020) ...................................................................................27

*Langston Kiser v. Gladieux*,
22-cv-432, 2022 WL 17476937 (N.D. Ind. Dec. 5, 2022) ...........................48, 55

*Lewis v. Casey*,
518 U.S. 343 (1996).................................................................................57

*Long v. White*,
12-cv-32, 2012 WL 6527743 (S.D. Ind. Dec. 13, 2012)...................................36

*Massey v. Helman*,
196 F.3d 727 (7th Cir. 1999) .....................................................................57

*Mathews v. Eldridge*,
424 U.S. 319 (1976).................................................................................47

*Mays v. Dart*,
974 F.3d 810 (7th Cir. 2020) ....................................................................47

*McGee v. Parsano*,
55 F.4th 563 (7th Cir. 2022) .....................................................................41

*Miranda v. County of Lake*,
900 F.3d 335 (7th Cir. 2018) ....................................................................47

*Monell v. Dept. of Social Services of the City of New York*,
436 U.S. 658 (1978)..........................................................................*passim*

*Mulvania v. Sheriff of Rock Island County*,
850 F.3d 849 (7th Cir. 2017) ............................................45, 47, 51, 54

*Owens v. Hinsley*,
635 F.3d 950 (7th Cir. 2011) ....................................................................57

*Pulera v. Sarzant*,
966 F.3d 540 (7th Cir. 2020) ............................................41, 43, 54, 56

*Rhodes v. Chapman*,
452 U.S. 337 (1981).................................................................................47

*Riccardo v. Rausch*,
375 F.3d 521 (7th Cir. 2004) ....................................................................35

*Rice ex rel. Rice v. Corr. Med. Servs.*,
675 F.3d 650 (7th Cir. 2022) ..................................................................29

*Robinson v. Milwaukee Secure Detention Facility*,
15-cv-263, 2016 WL 3620770 (E.D. Wis. 2016) ....................................50

*Sallenger v. City of Springfield, Ill.*,
630 F.3d 499 (7th Cir. 2010) ..................................................................29

*Snipes v. DeTella*,
95 F.3d 586 (7th Cir. 1996) ..............................................................36, 47

*Sullivan v. Lake County Jail*,
22-cv-191, 2022 WL 15481043 (N.D. Ind. Oct. 27, 2022)......................49

*Thomas v. Cook Cnty. Sheriff's Dept.*,
604 F.3d 293 (7th Cir. 2010) ....................................................29, 37, 53

*Thomas v. Dart*,
39 F.4th 835 (7th Cir. 2022) ..................................................................48

*Westefer v. Snyder*,
422 F.2d 570 (7th Cir. 2005) ..................................................................47

*Williams v. Bierman*,
46 F.3d 1134 (7th Cir. 1995) ..................................................................48

*Williams v. Garden*,
22-cv-977, 2022 WL 3212202 (S.D. Ill. Aug. 9, 2022) ..........................49

*Williams v. Ortiz*,
937 F.3d 936 (7th Cir. 2019) ..................................................................48

*Wood v. Milwaukee County*,
22-3030, 2023 WL 5348344 (7th Cir. Aug. 21, 2023)............................53

**Statutes**

42 U.S.C. § 1983 ..........................................................................*passim*

28 U.S.C. § 1915A(a)............................................................................11

## Other Authorities

U.S. Const. Eighth Amendment......................................................................*passim*

U.S. Const. Fourteenth Amendment...............................................................*passim*

Cir. R. 31(e) ...............................................................................................61

Cir. R. 32(c) ...............................................................................................60

Fed. R. App. P. 32(a). ..................................................................................60

Fed. R. App. P. 32(f)....................................................................................60

Fed. R. App. P. 32(g) ...................................................................................60

U.S. Constitution..........................................................................................*passim*

## JURISDICTIONAL STATEMENT

Plaintiff-Appellant's Jurisdictional Statement is not complete and correct. The District Court had jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the Fourteenth Amendment of the United States Constitution, and pursuant to 28 U.S.C. § 1343 because relief is sought under 42 U.S.C. § 1983. The United States Court of Appeals for the Seventh Circuit has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291, as this is an appeal from a final judgment or order of the United States District Court for the Eastern District of Wisconsin. The order appealed from was entered by the District Court, the Honorable William E. Duffin, on May 14, 2024. Plaintiff-Appellant timely filed his Notice of Appeal on June 3, 2024. No issues remain before the District Court.

## STATEMENT OF THE ISSUES

1. Whether the District Court properly dismissed Plaintiff-Appellant's 42 U.S.C. § 1983 *Monell* claim against Defendant-Appellee Milwaukee County alleging unconstitutional inmate health care policies.

2. Whether the District Court properly dismissed Plaintiff-Appellant's 42 U.S.C. § 1983 *Monell* claim against Defendant-Appellee Milwaukee County alleging unconstitutional COVID-19 policies.

3. Whether the District Court properly dismissed Plaintiff-Appellant's 42 U.S.C. § 1983 *Monell* claim against Defendant-Appellee Milwaukee County alleging unconstitutional policies pertaining to the conditions of confinement, specifically sanitation and cleanliness, at Milwaukee County Jail.

## STATEMENT OF THE CASE

### I.   RELEVANT FACTS

#### A. Background

Plaintiff-Appellant Calvin Lee was incarcerated at Milwaukee County Jail ("MCJ") from December 16, 2020, to April 18, 2023. (R. 39, ¶ 4.) Milwaukee County Jail has in place several policies and procedures related to sanitation, hygiene, and health care. (R. 39, ¶ 5.) These policies and procedures ensure a safe and clean environment for all occupants and personnel, provide ample cleaning supplies to its occupants, and ensure adequate health care for inmates. (*Id.*) None of these policies or procedures is imposed for the purpose of punishing inmates. (R. 39, ¶¶ 6, 8, 18, 19, 29, 34, 44-45, 49, 52, 56.)

#### B. MCJ's COVID-Related Policies and Procedures

During the relevant time period, MCJ had in place policies and procedures designed to minimize the risk of contracting or spreading communicable diseases. (R. 39, ¶ 6; R. 39-1.)  Specifically, Policy 715 includes ten different general precautions along with reporting requirements, exposure prevention, and required training. Additionally, when the Covid-19 pandemic began, MCJ enacted procedures based on guidance and direction from trained medical professionals, including public health officials and the Centers for Disease Control and Prevention. (R. 39, ¶ 8.) Beginning in April 2020, MCJ implemented policies and practices to enhance social distancing to the extent possible to safeguard the health

13

and safety of officers and inmates as the Covid-19 pandemic continued spreading globally. (R. 39, ¶ 10.) Inmates were required to wear masks at all times while outside of their cells. (R. 39, ¶ 11.) All officers were required to wear personal protective equipment while interacting with inmates. (*Id*.) Only half of each housing unit was allowed out of their cells at a time, and all gyms were temporarily closed. (R. 39, ¶¶ 12-13.) As mentioned by Lee in his Complaint (R. 6, pp. 9-10), MCJ instituted an alternating schedule for pods to have access to the dayroom to ensure that inmates were as protected as possible against the transmission of Covid-19 while also having at least some recreation time. (R. 39, ¶¶ 12-13.)

As the pandemic continued and as testing for Covid-19 became available on a limited basis, on July 27, 2020, Inspector Aaron Dobson, who was the Jail Commander until April 2023, sent out Directive J2020-1 for COVID-19 testing and the requirements for the Jail staff. (R. 39, ¶ 14; R. 39-2.) Directive J2020-1 required periodic and targeted testing of employees, the inmate population and staff. (*Id*.) Failure to comply with the testing required by J2020-1 was considered insubordination and would be referred to Internal Affairs for proper disposition up to and including termination. (R. 39, ¶ 14.) Because of the severely limited number of Covid-19 tests available during the first year of the pandemic, MCJ selectively administered periodic and targeted Covid-19 tests to employees, occupants, and

14

staff based on infection trends and using all available guidance from public health officials and the CDC. (R. 39, ¶ 15.)

Nevertheless, Milwaukee County employees, including correctional staff, were required to screen for symptoms and exposure each day that they were working in-person, and the screening had to be completed before or upon entrance to the work site. (R. 39, ¶ 16.) Milwaukee County employees were also required to wear masks at all times at County facilities, including MCJ. (R. 39, ¶ 11.) MCJ was subject to and adhered to all directives and administrative orders enacted by the County related to Covid-19. (R. 39, ¶ 17.) Even Lee conceded in his Complaint that these policies and practices were "rigorous." (R. 6, p. 10.)

The purpose of the Milwaukee County Jail's COVID-19 protocol restricting occupants to their cells was to prevent the spread of the virus. (R. 39, ¶¶ 18, 57.) MCJ's Covid-19 policies and procedures restricting inmates to their cells during certain times of day or for longer hours were not imposed for purposes of punishment of inmates. (R. 39, ¶ 18.)

### C. MCJ's Health Care-Related Policies and Procedures

Milwaukee County has robust and detailed policies pertaining to inmate medical and mental health care. (R. 39, ¶ 19; R. 39-3.) These policies ensure that inmates are seen in a timely manner by trained medical professionals and receive appropriate treatment for both physical and mental complaints. (*Id*.) Milwaukee

15

County contracts with Wellpath for healthcare services to inmates at MCJ. (R. 39, ¶ 21.) Milwaukee County correctional staff are not trained medical professionals and play no role in providing medical care to inmates other than basic first aid as needed. (R. 39, ¶ 22.) Correctional staff defers to trained health care professionals employed by Wellpath for all inmate health care decisions. (*Id*.) Jail staff play no role in decisions about inmate medications, including prescription medications, dosage, brand vs. generic, timing of doses, etc. (*Id*.) When inmates submit medical request slips or medical-related grievances, corrections staff is limited to routing those requests and grievances to Wellpath for response. (R. 39, ¶ 23.)

Regardless, it is Milwaukee County policy and practice that, through its contract with Wellpath, MCJ inmates receive routine medical and mental health care and treatment as well as emergency medical care. (R. 39, ¶ 24; R. 39-3.) It is also MCJ policy and practice that inmates who need health care or specialty care that is beyond the resources available in the facility are referred for outside or specialty medical care that is coordinated by Wellpath. (R. 39, ¶ 25; R. 39-3, p. 5.) Similarly, it is MCJ policy and practice that inmates with chronic diseases or special needs receive all necessary treatment through enrollment in a chronic disease program. (R. 39, ¶ 26; R. 39-3, pp. 20-23.) It is MCJ policy and practice that incoming inmates' current medications are verified by Wellpath and continued

if deemed appropriate by trained health care professionals employed by Wellpath. (R. 39, ¶ 27; R. 39-3, pp. 31-37.)

It is MCJ policy that when an inmate purposely starves himself or goes on a hunger strike, the inmate is moved to a medical unit for suicide observation. (R. 39, ¶ 28.) The purpose of the MCJ policy of placing inmates on hunger strike on observation status is not to punish the inmate; rather, it is to protect the occupant from committing further harm to himself. (R. 39, ¶ 29.) Accordingly, it is MCJ policy that inmates who are placed on observation status as a result of a hunger strike may only be removed from observation status when deemed appropriate by trained health care professionals. (R. 39, ¶ 30.)

### D. MCJ's Policies and Practices Related to Sanitation, Cleanliness, and Maintenance.

MCJ maintained policies and procedures during the relevant time period pertaining to cleanliness, maintenance, and hygiene. (R. 39, ¶¶ 32-33, 40, 42; R. 39-4 – R. 39-7.) Inmates housed in general population are required to clean their cells before the pod officer will open the pod dayroom for the day. (R. 39, ¶¶ 35, 60; R. 39-5, p. 17; R. 39-7; R. 39-13, p. 1.) Each pod officer is in charge of ensuring that their pod has adequate cleaning supplies, which include a broom, dust pan, dust mop, cleaning spray, and toilet bowl cleaner. (R. 39, ¶ 36; R. 39-5, pp. 16-17; R. 39-7.) Correctional officers ask inmates if they would like to use the cleaning supplies each morning, or pod porters—who are inmate workers—will

17

take the cleaning supplies from cell to cell and inquire whether each inmate wants to use the supplies. (R. 39, ¶ 37.) If an inmate wants to use the cleaning supplies, they are provided to the inmate. (*Id*.)

Cleaning supplies are available to inmates every day and remain available for as long as they are needed for inmates to clean their cells. (R. 39, ¶ 38.) If for some reason an inmate does not have immediate access to the cleaning supplies (maybe the inmate has a court hearing or visitor during the normal cleaning time), it is MCJ policy that the pod ensures that the inmate gets access to the supplies if he wants them later in the day. (*Id*.) Similarly, if there are extenuating circumstances—such as an inmate getting sick or spilling something in his cell—officers will provide additional time for cleaning supplies or request inmate workers to clean the area. (*Id*.) The cleaning agents provided to inmates properly sanitize and sterilize the surfaces on which they are used in order to combat communicable diseases. (R. 39, ¶ 39.) While the cleaning spray run may occasionally run out before all inmates have had a chance to use it, correctional officers ensure that more is available the following day for everyone to use. (R. 39, ¶ 38.)

In addition to the supplies provided to inmates daily, MCJ also has teams of inmate workers who clean areas of the facility other than cells and dayrooms. (R. 39, ¶ 40; R. 39-6; R. 39-7.) These inmate workers have cleaners, sprays, and a

18

water hose with a power spray attachment. (R. 39, ¶ 41.) Inmate workers are in charge of cleaning the shower areas about once per week, depending on staffing levels. (*Id*.) Additionally, as a result of the Covid-19 pandemic, MCJ instituted more frequent cleanings including daily sanitization of showers and dayrooms. (R. 39, ¶ 42; R. 39-7.) Inmate workers use bleach along with products called Bio Clean and Viro-Stat to clean the bathrooms, including the shower areas. (R. 39, ¶ 43.) Bleach, Bio Clean, and Viro-Stat are designed to kill mold and disinfect surfaces, but they do not always remove the color of stains created by mold or mildew. (R. 39, ¶ 43; R. 39-8.) When the inmate cleaning crew cleans shower areas, they power wash the showers and spray the entire area with disinfectant cleaning spray, including any areas that are prone to mildew or mold. (R. 39, ¶ 44.) If inmates submit grievances or the mold begins to spread beyond the caulking into the grout of the tiles in the shower, the cleaning crew always addresses the issue as quickly as possible based on staffing levels and the other needs of the facility. (R. 39, ¶¶ 44-45.)

Additionally, Milwaukee County contracts with Batzner Pest Control for pest control services at MCJ. (R. 39, ¶¶ 51-52; R. 39-11.) Milwaukee County correctional staff are not trained pest control professionals and play no role in decisions about pest control, such as how often the Jail is sprayed with pesticides.

19

(R. 39, ¶ 52.) In addition to contracting with Batzner Pest Control, MCJ also has two bug-zapping machines located between the dock and the kitchen. (*Id.*)

If there is a more significant need for cleaning, such as if there is blood, vomit, or other bodily fluids present in a pod, Milwaukee County Jail also has teams of specialized biohazard inmate workers in place who will address these issues. (R. 39, ¶ 46; R. 39-9.) These teams respond to frequent flooding events caused by inmates who purposely flood their cells. (R. 39, ¶ 46.) They use a water vacuum (somewhat like a shop vac) to suck up the excess water. (R. 39, ¶ 47.) Then the workers use towels on the floor to dry the remainder of the water. (*Id.*) After that, the workers spray disinfectant solvents on the floor and use towels to ensure full coverage of the disinfectant on the floor and any affected surfaces. (*Id.*) The workers complete the sanitization process by drying the floor. (*Id.*)

Related to addressing incidents of flooding, Milwaukee County employs several plumbers who are available to respond to issues at MCJ. (R. 39, ¶ 48.) However, Milwaukee County does not have plumbers working on site at MCJ 24 hours a day. (*Id.*) When incidents occur during off hours that require immediate action, like flooding, jail staff pages the on-call plumber. (*Id.*) The on-call plumbers always arrive within one hour of being paged and work as quickly as possible to repair any issues. (*Id.*) For non-emergent plumbing-related problems, corrections staff submits work orders to the 3D Pod Officer, and the 3D Pod

20

Officer enters the information into the facilities maintenance program for maintenance workers, including plumbers. (R. 39, ¶ 49.) Work orders are addressed as quickly as possible based on staffing levels and the other needs of the facility. (*Id.*)

## II. PROCEDURAL HISTORY

On September 20, 2022, Lee filed a Complaint in the United States District Court for the Eastern District of Wisconsin naming Milwaukee County, Milwaukee County Sheriff's Department, Milwaukee County Jail, and Wellpath as defendants. (R. 1). The Complaint alleged "a slew" of "purported violations of his rights," including assertions about inadequate health care and medication, excessive confinement, and unlawful bail practices. (*See* R. 5, pp. 2-4.) He also asserted a sort of catch-all claim related to his conditions of confinement, alleging a lack of sanitation, corroded fixtures, lack of access to water, clogged toilets not being fixed fast enough, and a lack of timely responses to his grievances. (R. 1; R. 5, pp. 2-4.)

On October 27, 2022, the District Court issued a Screening Order pursuant to the Prison Litigation Reform Act, 28 U.S.C. § 1915A(a). (R. 5.) In that Order, the District Court dismissed Milwaukee County Sheriff's Department and Milwaukee County Jail. It dismissed Lee's claims related to his bail amount, and it explained that Lee would need to choose how he wanted to proceed by filing an

21

amended complaint: he could pursue Milwaukee County for the alleged conditions of his confinement (inadequate medical treatment, excessive confinement, and unsanitary conditions) under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978); he could proceed against Wellpath under *Monell* for their alleged inadequacies; or, he could pursue both Milwaukee County and Wellpath under *Monell*, but only for the sole "related claim against both defendants" involving the allegedly inadequate medical treatment. (R. 5, pp. 6-8.)

On November 14, 2022, Lee filed two amended complaints. (*See* R. 6, 8.) In one, Lee sought to proceed against Milwaukee County. In the other, Lee sought to proceed against Wellpath. (R. 8.) The District Court issued an Order stating that these two filings did not comply with the directions of its Screening Order and directed Lee to decide which claims he wanted to pursue by December 14, 2022. (R. 8, p. 2.) If Lee did not decide by that date the claims he would pursue, the District Court would only allow him to proceed against Milwaukee County on the claims set forth in the original complaint. (*Id.*) On November 30, 2022, Lee wrote to the District Court as instructed and indicated that he wished to proceed on his claims against Milwaukee County stated in his Amended Complaint. (R. 9.)

The District Court then entered a second Screening Order on December 27, 2022, screening Lee's Amended Complaint. (*See* R. 6, 11.) The allegations in the Amended Complaint were substantially similar to those in the original complaint,

22

but Lee added claims, including several asserting "judicial and prosecutorial misconduct" and price gouging via over-charging detainees for phone calls and tablet usage. (R. 6, pp. 5-9; R. 11, pp. 6-8.) The District Court permitted Lee to proceed on the Fourteenth Amendment claims against Milwaukee County related to Lee's conditions of confinement stated in his original complaint, including unsanitary conditions, inadequate health care, and excessive lockdowns. (R. 11, p. 5.) It specifically allowed Lee to seek damages and prospective declaratory and injunctive relief. (*Id*., p. 9.) It dismissed Lee's other claims and allegations as being unrelated or not cognizable under the Constitution, and it did not permit Lee to proceed on any claims for declaratory judgment regarding completed, past violations of his rights. (R. 5, p. 11; R. 11, p. 9.)

On December 8, 2023, Defendant-Appellee Milwaukee County filed a Motion for Summary Judgment seeking dismissal of all claims as a matter of law. (R. 36-40.) Lee filed a response on January 11, 2024. (R. 44-46.) Milwaukee County filed a reply in support of its motion on January 18, 2024. (R. 47.) On May 14, 2024, the District Court issued a Decision and Order granting Defendant-Appellee's Motion for Summary Judgment in its entirety.

On Lee's claims related to COVID-19 policies, the District Court held that Lee did not present any evidence showing that the policies in question were unreasonable under the circumstances posed by COVID. (R. 49, pp. 9-10.) The

23

District Court held that Lee did not point to any evidence showing a pattern of unconstitutional conditions at MCJ related to sanitation, and many of his allegations did not rise to the level of a constitutional violation. (*Id.*, pp. 10-12.) And on Lee's assertions related to medical care, the District Court held that Lee's claims failed on two fronts: he did not produce evidence showing that Milwaukee County was on notice of any problems related to medical care; and, he failed to show a widespread pattern or practice of Wellpath providing objectively unreasonable medical care. (*Id.*, pp. 12-13.) The District Court entered a final judgment on May 15, 2024, dismissing Lee's claims with prejudice. (R. 50.)

## SUMMARY OF THE ARGUMENT

This Court should affirm the District Court's decision holding that none of Milwaukee County's policies and practices at MCJ caused a deprivation of Lee's constitutional rights. At summary judgment, Lee failed to identify any evidence showing the existence of any kind of widespread pattern or practice of unconstitutional conduct related to any of his "slew" of complaints that could give rise to municipal liability under *Monell*. Instead, he relied only on isolated examples and his own opinions about or disagreement with his treatment and housing.

On appeal, Lee has not rectified any of the failings of his summary judgment response. Again, he fails to identify evidence that, even when viewed in the light most favorable to him, could plausibly establish 1) the existence of widespread unconstitutional policies or practices; and 2) that any such widespread policy or practice directly caused a deprivation of his rights. Similarly, each of Lee's criticisms of the District Court's decision lack merit. While he makes generalized allegations that the District Court "wholly disregarded" evidence that would have saved his claims, he does not identify that evidence or explain how it could overcome the evidentiary shortcomings established by binding precedent and pointed out by the District Court in its decision.

25

Here as in the District Court, the undisputed facts and binding case law do not establish a triable issue of fact on whether Lee's constitutional rights were violated under any recognized framework applicable to *Monell* claims. Accordingly, this Court should affirm the District Court's decision granting Defendant-Appellee's Motion for Summary Judgment.

## STANDARD OF REVIEW

A district court's grant of summary judgment in a case brought under 42 U.S.C. § 1983 is subject to *de novo* review. This Court may affirm on any basis for which it finds support in the record and that was adequately presented to the district court. *King v. Henricks County Comm'r*, 954 F.3d 981, 983-984 (7th Cir. 2020).

Summary judgment is appropriate when there is no dispute of material fact, and the movant is entitled to judgment as a matter of law. *Id*. (citing Fed. R. Civ. P. 56(a)). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted to the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A material fact is one that is outcome-determinative of an issue in the case with substantive law identifying which facts are material. *Id*. at 248.

Once the moving party meets this initial burden, the opposing party must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id*. at 256. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id*. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id*. at 248.

**ARGUMENT**

A *Monell* plaintiff must show that some municipal action <u>directly</u> caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021). As the District Court explained, three types of municipal action can give rise to an actionable *Monell* claim: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." (R. 49, pp. 8-9 (quoting *Dean*, 18 F.4th at 235).)

Milwaukee County had in place express policies about sanitation, hygiene, and access to health care to ensure the health and safety of MCJ inmates. Because MCJ's express policies were indisputably constitutional, Lee can only prevail if he can show the existence of a widespread custom or practice of unconstitutional conduct through a pattern of similar incidents. *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654-655 (7th Cir. 2021). For purposes of a *Monell* claim, "[a] practice is not a random event, and isolated acts by individual employees are not sufficient to establish a widespread practice" of unconstitutional

conduct as required to state a claim under § 1983. *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 303-304 (7th Cir. 2010).

Rather, a "widespread practice" is one "which, although unwritten, is so entrenched and well-known as to carry the force of policy." *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014) (quoting *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012)). "[T]here is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' or even three." *Thomas*, 604 F.3d at 303 (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)); *see also Dean*, 18 F.4th at 236.

Additionally, where the plaintiff is unable to establish any underlying constitutional violation of his rights, his *Monell* claim necessarily fails. *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010); *Dean*, 18 F.4th at 236.

## I.  LEE FAILED TO DEMONSTRATE THAT ANY MILWAUKEE COUNTY POLICY CAUSED A CONSTITUTIONAL DEPRIVATION RELATED TO HIS MEDICAL OR MENTAL HEALTH CARE.

Lee's medical-related claims against Milwaukee County fail as a matter of law for at least three reasons: 1) Lee has not shown that his constitutional rights were actually violated through inadequate medical care; 2) Lee has not identified any Milwaukee County policy or custom that was the moving force behind any

29

violation of his constitutional rights; and 3) Lee has not established that Milwaukee County was on notice of any widespread policy or custom that violated his rights.

## A. Lee Did Not Receive Objectively Unreasonable Medical Care.

Lee claimed that he was denied adequate mental and medical health services because MCJ told him "that it does not provide the long-term care" that he believes is required to treat his issues. (R. 6, p. 12.) However, Lee mischaracterized both his requests and the responses he received. On September 2, 2021, Lee submitted a grievance stating:

> As a veteran of the US military, veteran services/resources have been anything but available. No services have been made available during this pandemic to address any veteran related issues including mental Health Resources, which I have personally requested.

(R. 39-12, p. 1.) Less than two hours later, corrections staff responded as follows:

> Please be advised the facility currently does not have any volunteers for this request// The facility does have Mental health. Please fill out a white slip check mental health and briefly explain the issue on the paper.

(*Id.*) Almost two weeks later, on September 14, 2021, Lee appealed the response by stating that his mental health issues were "due to combat-related trauma, which this facility is ill equipped for. No substitutes or alternatives have been made available either (i.e. neuropsychology)." (*Id.*) But nothing in Lee's grievance appeal or in the record suggests that any correctional staff had any reason to

believe that the treatment options available to Lee were inadequate or inappropriate to meet his needs.

Wellpath medical staff then further clarified for Lee that they had requested and reviewed his medical records from the VA, just as required by MCJ's policies pertaining to continuity of health care. (R. 39-12, p. 1.) But those records did not indicate a need for more or different treatment or any medication. (*Id.*) Wellpath's response also reiterated that they offered several mental health services to MCJ inmates, including crisis intervention, counseling, and medication management. (*Id.*) While they do not offer long-term therapy, there is no indication that any provider determined that Lee needed long-term therapy or any other service for that matter. Instead, Lee appears to believe that his status as a combat veteran entitles him to demand specific treatment or services. Regardless, nothing in the record suggests that correctional staff should have suspected that Lee was not being adequately treated or that they should second-guess the decisions of any trained medical professionals. "A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009).

Next, Lee filed a grievance on September 20, 2021. (R. 39-12, p. 2.) In that grievance, Lee complained:

> I've been suffering from nerve pain for weeks now. After talking w/ medical, policy prevents proper treatment for severity of this issue

31

which can result in permanent nerve damage. Requests for apparatus/medication to prevent this issue can't be provided.

Wellpath responded:

There are interventions available to assist with nerve pain. It does not appear that you've tried these medications in the past. Please submit sick call request for medical if you are willing to try these interventions.

(*Id*.) Lee's response was, in essence, that he knows better than the jail's medical staff and he was refusing to try any interventions at all other than his preferred intervention of "proper lumbar support":

The only "interventions" available are mental health medications that do little to nothing for pain or prevention of pain and inflammation of the underlying issue, and a TENS machine (shock treatment) that won't be available enough to me to do any good; which means permanent damage to the nerve is still a likely outcome, even with a combination of these treatments. The aggravation of this ailment is best prevented b[y] proper lumbar support, which policy prevents this facility from providing.

(*Id*.)

Confused by Lee's statements, Wellpath responded by asking, "What are you requesting? What policy are you referring to?" (R. 39-12, p. 2.) But Lee never responded. (*Id*.) Regardless, nothing in Lee's response about "proper lumbar support" would give corrections staff reason to know that MCJ medical staff were not providing treatment options for Lee's complaints. Indeed, staff specifically noted that interventions existed, and Lee simply had not tried them. And

32

Milwaukee County does not have any policy that pertains to lumbar support for inmates. (R. 39, ¶ 54.)

Next, Lee claimed that he had to "demand hospitalization" on October 3, 2021 "in order to receive a series of injections to alleviate the issue." (R. 6, p. 12.) While he did not specify what "the issue" was, a review of his Request Report shows that on October 3, 2021, Lee submitted a request about nerve pain:

> About 4 days ago I spoke with a provider about receiving a Ketorolac injection to help with nerve pain. I just wanted to follow up to see if I'll be receiving it, as it would help me immensely with this pain.

(R. 39-12, p. 2.) Wellpath responded to the request on October 6, 2021, confirming that Lee received a ketorolac injection on October 4, 2021. (*Id.*) There is no record of Lee "demanding hospitalization" to any correctional officer at any time. (*See* R. 39-12.) And because staff confirmed that Lee received his requested treatment, there was certainly no reason for correctional staff to know that he was not receiving adequate treatment.

Lee then mentioned a January 4, 2022, request to speak to "a VA volunteer services coordinator," and vaguely claimed that the response he received "yielded negative results, producing no fruitful alternative to the request." (R. 6, p. 12-13; R. 39-12, p. 8.) However, staff responded to his request less than an hour later explaining, "please be advised that all volunteer services have been cancelled until further notice." (R. 39-12, p. 8.) Lee did not appeal or respond further. (*Id.*) In any

33

event, there is nothing about the request that would indicate to any reasonable corrections officer that it was being submitted because of inadequate health care being provided to Lee by Wellpath.

Lee also referred to a January 10, 2022 "attempt to seek adequate care/resources." (R. 6, p. 12.) The only request submitted on that date related to any kind of resources was a grievance in which Lee stated, "I have repeatedly requested staff for the name of the VA coordinator but have yet to receive it. Who is it?" (R. 39-12, p. 10.) The following day, correctional staff responded reminding Lee to review the response to his previous request. (*Id.*) Staff also explained again that MCJ does not have a Veteran Coordinator. (*Id.*) The response further advised that Lee would receive veteran-related information from the law library on January 11, 2022, and that he would need to contact the VA himself. (*Id.*) However, "the facility case manager would be able to assist" with his efforts. (*Id.*)

Lee did not submit any further requests about this issue or appeal this response. (*See* R. 39-12.) In any event, because the grievance made no mention of health care and did not allege that Lee was not receiving care as ordered, there was no reason for correctional staff to question whether Lee was receiving appropriate medical attention.

Finally, Lee asserted in his Amended Complaint that, after he went on a four-day hunger strike, he was punished by being placed on suicide watch in the

Special Needs Housing Unit instead of being provided with mental health and veteran services. (R. 6, pp. 13-14.) Lee argued in the District Court that his transfer to the Special Needs Housing Unit was actually "unnecessary," because he agreed to "end his actions" before being moved. (R. 45, p. 5.) He further alleged that his placement in this unit, instead of remaining in general population, was punishment because it was done "for no plausible reason" and implied that he was "not fit" for housing in general population. (*Id.*)

However, it was undisputed that, pursuant to Milwaukee County policy, when an inmate purposely starves himself or goes on a hunger strike, the inmate is moved to a medical unit for suicide observation. (R. 46, ¶ 34; R. 38, ¶ 34 (citing R. 39, ¶ 28.) Similarly, Lee conceded that the purpose of this policy is to protect the inmate from committing further harm to himself, and it is not imposed for purposes of punishment. (R. 46, ¶¶ 35-36; R. 38, ¶¶ 35-36 (citing R. 39, ¶ 29).) Lee repeatedly confirmed that he purposely went on a hunger strike for four days, meaning there was indisputably a "plausible reason" for this move out of general population for observation. To the extent that he argues that he did not need to be put on any special watch status because he agreed to voluntarily end his hunger strike, the Constitution does not oblige officers to believe whatever inmates say. *Riccardo v. Rausch*, 375 F.3d 521, 527 (7th Cir. 2004).

On this first element, Lee has not shown that he received unconstitutional medical care. He simply disagreed with the options for treatment he was offered, or he would have preferred different treatment, or he wanted treatment through the Department of Veteran's Affairs. But mere dissatisfaction or disagreement with a doctor's course of treatment is insufficient to show deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) And an inmate—even if he is a veteran, as Lee is—has no constitutional right to demand specific treatment or certain providers. *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Long v. White*, 12-cv-32, 2012 WL 6527743 at * 3 (S.D. Ind. Dec. 13, 2012); *Harper v. Santos*, 847 F.3d 923, 926-7 (7th Cir. 2017).

As the District Court correctly concluded, Lee failed to prove that Wellpath was not providing objectively reasonable care as it was contracted to provide or that his constitutional rights were otherwise violated. (R. 49, p. 13.) Without evidence of an underlying constitutional violation, Lee's claim must be dismissed. *Dean*, 18 F.4th at 236.

### B. Lee Failed to Establish that Milwaukee County had Notice of Any Unconstitutional Conduct Caused by its Policies.

Even assuming Lee could show that Wellpath provided objectively unreasonable medical care, summary judgment dismissal was nevertheless appropriate. The element of notice is especially crucial to a finding of liability under *Monell*. It is undisputed that Milwaukee County has a non-delegable duty to

36

provide inmates with adequate health care. Milwaukee County contracted with Wellpath to provide this care, as it was entitled to do. *See Figgs v. Dawson*, 829 F.3d 895, 903-4 (7th Cir. 2016). Where—as here—a municipality contracts with a third party to provide an otherwise non-delegable duty and a plaintiff alleges a violation of his rights related to that duty, the plaintiff must still point to evidence of a pattern of similar violations in order to establish the municipality's awareness of a problem. (*See* R. 49, p. 12 (quoting *Thomas*, 604 F.3d at 303).) "In other words, [the county] must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id*.

A wealth of case law explains what is necessary to establish this awareness. Evidence of a prior pattern of similar violations "puts the municipality on notice of the unconstitutional consequences of its policy, such that its 'continued adherence' to the policy might 'establish the conscious disregard for the consequences of its action—the deliberate indifference—necessary to trigger municipal liability.'" *Dean*, 18 F.4th at 236. Without notice of a problem, a municipality cannot consciously disregard the consequences of its actions vis-à-vis that problem.

As the District Court pointed out, "to prove a widespread pattern or practice, a plaintiff 'must show more than the deficiencies specific to his own experience, of course.'" (R. 49, p. 13 (quoting *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016)).) But that is all Lee has done. He points to the many grievances he filed

37

during his incarceration and alleges that these grievances gave Milwaukee County notice of a pattern of unconstitutional conduct. (Doc. 4, pp. 9-10.) But the District Court reviewed those grievances in their entirety and confirmed "that any medical-related complaints went directly to Wellpath staff." (R. 49, p. 13.) And on his claim related to his move to the Special Needs Housing Unit, Lee did not allege any other instances of unconstitutional placement on suicide watch at all, let alone facts that would suggest the existence of an unconstitutional policy or practice of which Milwaukee County was or should have been aware.

In an attempt to rectify this flaw in his argument, Lee now cites circumstantial evidence in the form of various written MCJ policies about inmate health care. He alleges that because of these policies, Milwaukee County had "direct involvement" in the provision of health care—and therefore had notice that the policies were not being followed. (Doc. 4, pp. 9-10.) However, Lee does not explain how any particular correctional officer or official was involved in his medical care via these policies such that the County itself could be said to have been "aware" of a pattern or practice of unconstitutional conduct.

To the contrary, the cited policies only confirm that correctional staff was not involved in Lee's care at all. For example, Lee points to Policy 701 "Access to Health Care," which reads, "Inmate medical requests will be evaluated by qualified health care professionals." (R. 39-3, p. 1.) It further states, "All routine requests for

38

medical attention shall be promptly routed to a qualified health care professional." (*Id.*) As for grievances, "Inmate grievances regarding health care issues will be investigated by the assigned health care professional," and the "qualified health care professional shall serve as the final authority in response to all inmate grievances." (*Id.*, p. 2.)

Importantly, Lee conceded that Milwaukee County correctional staff are not trained medical professionals and play no role in providing medical care to inmates other than basic first aid as needed; instead, correctional staff defers to trained health care professionals employed by Wellpath for all inmate health care decisions. (*See* R. 46, ¶ 27; R. 38, ¶ 27 (citing R. 39, ¶ 22).) He also conceded that correctional staff is limited to routing medical request slips and medical-related grievances to Wellpath for review and response. (R. 46, ¶ 29; R. 38, ¶ 29 (citing R. 39, ¶ 23).) And on Lee's complaints that he was not moved from the Special Needs Housing Unit back to general population sooner, it is undisputed that MCJ correctional staff play no role in decisions related to inmate medical housing and that only a trained health care professional may make the determination to remove an inmate from observation status. (R. 46, ¶ 37; R. 38, ¶ 37 (citing R. 39, ¶ 30).)

Even assuming Lee could put forth evidence of a pattern of unconstitutional conduct related to inmate health care, nothing in these policies suggests that Milwaukee County was or would have been on notice of such a pattern existed.

The only other argument Lee offers is that Milwaukee County "should have been reasonably aware of" his medical conditions, because the County "was provided with access to the Plaintiff's medical history." (Doc. 4, p. 11.) He does not cite any evidence in the record to support his assertion about access to his medical history. In any event, knowledge about a person's medical needs does not establish knowledge about that person's medical treatment or its alleged shortcomings.

Ultimately, Lee's efforts to buttress his notice arguments miss the mark. Without evidence of deficiencies other than those "specific to his own experience," he has failed to show the requisite pattern or practice needed to prevail under *Monell*. (*See* R. 49, p. 13 (quoting *Daniel*, 833 F.3d at 734).) In addition to the lack of any evidence that could support an underlying claim, Milwaukee County confirmed that it was not aware of any pattern or practice of violations of its policies and practices of providing inmates with timely and adequate medical and mental health care similar to those alleged by Lee. (R. 39, ¶ 20.) Therefore, Lee's medical care *Monell* claim fails for both of these reasons.

## II. LEE FAILED TO DEMONSTRATE THAT ANY MILWAUKEE COUNTY POLICY RELATED TO COVID-19 CAUSED A CONSTITUTIONAL DEPRIVATION.

When a plaintiff alleges that he contracted COVID-19 as a result of any condition of confinement, the question is whether jail "responded reasonably to the pandemic or was reckless with the precautions" that were implemented. *Gasaway*

40

*v. Vigo Cnty. Sheriff's Dep't*, 672 F.Supp.3d 651, 658 (S.D. Ind. 2023). As with any *Monell* claim, a plaintiff alleging that a jail's response to COVID-19 was unreasonable must also demonstrate that the policymaker was on notice that his or her particular conduct violated inmates' Fourteenth Amendment rights. *Id.* Moreover, as a matter of law, it is objectively reasonable for jail administrators to defer to the guidance of trained medical professionals on how to handle COVID-19 within the facility. *See id.* (citing *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) and *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019)).

Lee's main argument related to MCJ's COVID-19 policies is that they were unconstitutional because he contracted COVID while incarcerated. (*See* R. 6, p. 10.) But that is not the proper measure of reasonableness under the Fourteenth Amendment. See *Gasaway*, 672 F.Supp.3d at 658. The Constitution does not require that a jail prevent every single inmate from contracting COVID-19 while incarcerated; rather, it requires that the jail respond reasonably. *See Heien v. North Carolina*, 574 U.S. 54, 60-61 (2014) ("To be reasonable is not to be perfect"); *Pulera v. Sarzant*, 966 F.3d 540, 555 (7th Cir. 2020) ("the Constitution does not demand perfection"). The District Court pointed out that "the fact that Lee contracted COVID is not proof that the policies and practices were unconstitutional," because Milwaukee County's "responsibility was to mitigate the spread of COVID, not stop it." (R. 49, p. 10.)

41

Nevertheless, Lee now contends that Milwaukee County's policies were nevertheless unreasonable because none of the COVID-19 policies or directives explicitly stated that they were "per the recommendation of the CDC, or any governmental directive." (Doc. 4, p. 5.) But Lee previously <u>conceded</u> that MCJ enacted additional procedures and protocol at the beginning of the pandemic that were based on guidance and direction from trained medical professionals, including public health officials and the Centers for Disease Control and Prevention. (*See* R. 46, ¶ 6; R. 38, ¶ 6 (citing R. 39, ¶ 8).) There is nothing objectively unreasonable about a jail not citing to each source relied upon when drafting policies or directives. And in any event, MCJ's COVID-19 testing directive did state that it was based upon CDC guidance. (*See* R. 39-2.) By following the guidance of trained medical professionals and instituting rigorous precautions, MCJ responded to the pandemic in an objectively reasonable manner.

Lee primarily complains about MCJ's "stringent confinement practices," alleging that MCJ confined him to his cell for "26.5, hours per day, every other day in alternating patterns." (R. 6, p. 9-10; Doc. 4, p. 5.) It is undisputed that on a limited number of occasions, Lee was confined in his cell for more than 23 hours a day. However, in every single instance, these longer lock-ins were non-punitive. (R. 39, ¶¶ 8, 18 57.) Instead, they were due to necessary quarantining of inmates exposed to or infected with COVID-19. (R. 39, ¶ 57.) To the extent that Lee now

42

alleges that these confinements "lasted for months on end," he has not cited any evidence in the record at all to support this claim. (*See* Doc. 4, p. 6.) Therefore, his assertion must be disregarded. *See* Fed. R. Civ. P. 56(c)(1).

On appeal, Lee does not point to any evidence at all suggesting that the quarantine and confinement practices were unnecessary or unreasonable; instead, he simply asserts that the COVID-19 precautions were "unwarranted, … completely cruel and unusual, and excessive in nature," because they were "completely contrary to any comparative standard of law." (Doc. 4, pp. 5-6.) He cites the Wisconsin Administrative Code as that standard. (*Id*.) However, it is well established that a violation of jail policies, state laws, or administrative code provisions does not create a constitutional violation enforceable under 42 U.S.C. § 1983. *Pulera*, 966 F.3d at 551; *Archie v. City of Racine*, 847 F.2d 1211, 1217 (7th Cir.1988) (en banc). And the District Court recognized this when it confirmed that keeping inmates in cells longer "than what is permissible in non-COVID circumstances in order to mitigate the spread is reasonable." (R. 49, p. 10 (emphasis added).)

Nevertheless, Lee points to various responses he received to his confinement-related grievances as evidence that Milwaukee County was on notice

43

of its wrongdoing. (Doc. 4, pp. 6-7.)[4] Of the nine listed responses, only the first seven pertain to the length of lockdowns. (*See* Doc. 4, p. 36 (Request No. 88760), and pp. 38-39 (Request No. 95508).) Specifically, Lee claims that officers' responses apologizing for the inconvenience "with minimal explanation," along with the failure of the responses to "circumvent these 'unforeseen' acts," "alludes to the practice [of lockdowns] being 'arbitrary' and 'purposeless.'" (Doc. 4, p. 7.) The fact that the lockdowns did not completely "circumvent" the spread of COVID-19 does not make them unreasonable. Similarly, the fact that officers politely apologized for the inconvenience does not make the practice any less reasonable. The cited responses do not constitute objective evidence that the lockdowns were done for punitive reasons, particularly in light of uncontroverted sworn statements by an MCJ Jail Commander confirming that these COVID-19 policies and procedures were <u>not</u> imposed for the purpose of punishment. (R. 39, ¶¶ 8, 18.) And without objective evidence, Lee's claim fails. *See Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849, 856 (7th Cir. 2017).

---

[4] Of note, Lee does not cite any document in the record but instead lists and summarizes nine requests or grievances he submitted while incarcerated. Defendant-Appellee assumes that Lee is referring to the Request Report included in his Appendix appended to his moving brief at Doc. 4, pp. 25 – 42. However, this Request Report shows that it is 21 pages (bottom right corner of document). This 21-page document was never filed in the District Court by any party and was therefore not part of the record on summary judgment. For the same reason, it is not part of the record on appeal. *See* Fed. R. App. P. 10(a). Rather, Defendant-Appellee filed Lee's complete Request Report, totaling 43 pages. (*See* R. 39, ¶ 53; R. 39-12). While the two documents appear similar, it is unclear whether there are any substantive omissions or differences between the 21-page document included by Lee and the 43-page report filed by Milwaukee County.

44

Milwaukee County did its best to balance inmates' need for recreation time with the health and safety of the entire facility, and there were times when COVID -19 outbreaks meant that inmate health and safety was prioritized. (R. 39, ¶ 58.) But in every instance, MCJ staff deferred to guidance from public health officials and did everything possible to limit the duration of such lock-ins. (R. 39, ¶ 59.) For example, MCJ employed rotating schedules for these quarantines to ensure that cohorts of inmates could still have recreation time at least every other day while minimizing inmate-to-inmate contact and maximizing social distancing. (*Id.*) Thus, even if Lee did contract COVID-19 while he was incarcerated, it was not objectively unreasonable to prioritize inmate health and safety and defer to guidance from experts during a pandemic.

Finally, Lee devotes a significant portion of his arguments about COVID policies to allegations about his placement in the Special Needs Housing Unit "for no plausible reason." (*See* Doc. 4, pp. 8-9.) He complains that this claim "went virtually unopposed by the Defendant" in its motion for summary judgment. (*Id.*, p. 8.) However, he did not allege a claim related to his housing in his Amended Complaint. Rather, Lee only mentioned the Special Needs Housing Unit in reference to his placement on suicide watch in that unit after he had been on a hunger strike for four days. (*See* R. 6, p. 13, as discussed, *supra*.) The District Court did not identify his placement in the Special Needs Housing Unit as an

45

independent claim on which Lee would be allowed to proceed (*see* R. 11), and Defendant-Appellee thoroughly addressed Lee's placement on observation status on summary judgment in its discussion of Lee's medical claims. Therefore, any contention that this issue remains undecided, or that Milwaukee County's arguments regarding this issue were undeveloped, can be disregarded.

### III. LEE FAILED TO SHOW THAT ANY MILWAUKEE COUNTY POLICY RELATED TO HIS CONDITIONS OF CONFINEMENT CAUSED A DEPRIVATION OF HIS CONSTITUTIONAL RIGHTS.

To prevail on a § 1983 claim alleging unconstitutional conditions of confinement under the Fourteenth Amendment, a plaintiff must demonstrate that 1) the conditions in question are or were objectively serious; 2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and 3) the defendant's actions were objectively unreasonable—that is, "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose." *Hardeman v. Curran*, 933 F.3d 816, 821-22 (7th Cir. 2019). Stated differently, "[a] pretrial condition can amount to punishment in two ways: first, if it is 'imposed for the purpose of punishment,' or second, if the condition 'is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment.'" *Mulvania*, 850 F.3d at 856 (quoting *Bell v. Wolfish*, 441 U.S. 520, 538-39 (1979)).

46

In determining whether a challenged action is objectively unreasonable, courts must consider the "totality of facts and circumstances." *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020). In conditions of confinement cases, courts are rightfully reluctant to interfere with the administration of prisons. *See Mathews v. Eldridge*, 424 U.S. 319 (1976); *Westefer v. Snyder*, 422 F.3d 570 (7th Cir. 2005). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" *Snipes*, 95 F.3d at 590. And although Lee frequently alleges negligence in his Amended Complaint, "negligent conduct does not offend the Due Process Clause." *Miranda v. Cty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018).

With respect to the severity of the conditions necessary to prevail on a Fourteenth Amendment claim, the Seventh Circuit has not specified exactly how severe the deprivation must be to implicate the due process clause. *See Caldwell v. Woock*, Case No. 18-cv-1074, 2023 WL 3582349, at *4. (W.D. Wis. 2023). However, the Supreme Court has stated that conditions must result in the denial of "'the minimal civilized measure of life's necessities'" to violate the Constitution. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

In more recent decisions, the Seventh Circuit has applied an "equivalence" of the Eighth Amendment standard to such claims under the Fourteenth Amendment. *See Caldwell*, 2023 WL 3582349 at *4 (citing *Thomas v. Dart*, 39

47

F.4th 835, 841 (7th Cir. 2022) (applying substantial risk of serious harm standard to failure-to-protect claim); *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (applying serious medical need for a medical care claim). To rise to the level of unconstitutionality under the Fourteenth Amendment, it is clear that the conditions in question must be objectively serious and must lack any rational relationship to a legitimate governmental objective. *See Caldwell*, 2023 WL 3582349 at *4 (citing *Hardeman*, 933 F.3d at 827 (Sykes, J. concurring)).

It is well-established that <u>temporary</u> neglect of an inmate's hygienic needs is insufficient to establish a constitutional deprivation. *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988) (keeping an inmate in a roach-infested cell and depriving him of toilet paper for 5 days and soap and toothpaste for 10 days does not violate the Constitution); *Williams v. Bierman*, 46 F.3d 1134 (7th Cir. 1995) (denial of cleaning materials for two weeks does not violate the Constitution); *Langston Kiser v. Gladieux*, No. 22-cv-432, 2022 WL 17476937 at *2 (N.D. Ind. Dec. 5, 2022) (holding that a temporary problem where the water in the plaintiff's cell was not working for approximately 24 hours and during which time his toilet had urine and mold in it was "no doubt unpleasant," but that it did not amount to the type of deprivation that would support a Constitutional claim); *Sullivan v. Lake Cnty. Jail*, No. 22-cv-191, 2022 WL 15481043, at *1 (N.D. Ind. Oct. 27, 2022) (cell toilet covered in urine and feces for one night, although "unpleasant and

48

inconvenient," did not amount to a Fourteenth Amendment violation); *Williams v. Garden*, No. 22-cv-00977, 2022 WL 3212202, at *1 (S.D. Ill. Aug. 9, 2022) (a "single clogged toilet does not give rise to a Fourteenth Amendment claim); *Jackson v. Duran*, No. 15-cv-1846, 2017 WL 8217063, at *6 (N.D. Ill. Dec. 14, 2017) (short-term deprivation of running water in detainee's cell "did not approach the objective level of seriousness that would implicate the Fourteenth Amendment").

Only significantly prolonged neglect of sanitation—far longer than anything alleged by Lee—may constitute a constitutional deprivation. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (pest infestation lasting 16 months was a "prolonged deprivation seriously impacting [plaintiff's] health"); *Board v. Farnham*, 394 F.3d 469, 482 (7th Cir. 2005) (denying an inmate toothpaste for 3.5 weeks was unconstitutional because adequate oral hygiene is necessary to prevent future medical illness).

### A. Lee's General Complaints About the Cleanliness of MCJ Fail as a Matter of Law.

Even if taken as true, Lee's generalized complaints about the conditions at MCJ all fall well short of the threshold of objective seriousness required to establish a constitutional violation. He vaguely asserts "unsafe and unsanitary conditions" (*see*, *e.g.*, R. 6, p. 21, ¶ 11), but the policies and practices described, *supra*, establish that Milwaukee County had adequate polices in place to ensure

safe and sanitary living conditions for inmates. Lee had daily access to cleaning supplies, including chemical agents that disinfect and sanitize surfaces. And more serious sanitation issues are addressed by specially trained and equipped biohazard teams.

Milwaukee County contracted with a reputable pest control company to regularly address any pest issues. Thus, although Lee claims that there was a "bug infestation" in various areas of MCJ (R. 6, p. 22, ¶ 12(a)), Milwaukee County was taking objectively reasonable steps to deal with pest control, and "[e]ven luxury hotels and apartments have bedbugs, cockroaches, and other pests." *Robinson v. Milwaukee Secure Detention Facility*, 15-cv-263, 2016 WL 3620770 at *2 (E.D. Wis. June 29, 2016). More importantly, it is undisputed that Lee did not file a single grievance alleging any insect or pest concerns. (R. 46, ¶ 96; R. 38, ¶ 96 (citing R. 39-12).) Thus, there is no evidence that any policymaker could have had notice of any conditions that might constitute a constitutional violation. *See J.K.J. v. Polk County*, 960 F.3d 367, 381 (7th Cir. 2020) (explaining that no matter what method is used to prove *Monell* liability, evidence of notice is always required).

Lee's complaint about allegedly "unclean/unserviced ventilation systems" (R. 6, p. 22) is baseless. Inmate workers clean vents in cells daily and the vents in the dayrooms as needed. (R. 39-7.) To the extent that Lee appears to take issue with the fact that the ventilation system "redistributes recycled air" in MCJ, he is

50

correct. That is how HVAC systems work. Every building with any kind of HVAC system recirculates and redistributes "recycled" air, other than perhaps laboratories with specialized (and very localized) vent hoods designed to prevent inhalation of dangerous fumes. The only way to avoid breathing "recycled air" would be to equip each inmate with some sort of mask and portable oxygen tank, which is obviously the antithesis of objective reasonableness. As for his complaint about "corroded" fixtures (R. 6, p. 22), he never submitted any requests or grievances alleging problems with corrosion (*see* R. 39-12), so there is certainly no way that MCJ could have been on notice of any pattern or practice of problems being caused by corrosion. In any event, as the District Court noted, claims of corroded fixtures "do not rise to the level of a constitutional violation." (R. 49, p. 11.)

While Lee appears to believe that the efforts make by Milwaukee County to keep MCJ sanitary and pest free are not enough, case law confirms that these practices objectively provided him with at least "the minimal civilized measure of life's necessities." *See Mulvania*, 850 F.3d at 856. After all, "[p]risons, of course, are not Hilton hotels." *Isby v. Clark*, 100 F.3d 502, 505 (7th Cir. 1996).

### B. Lee Failed to Show that Any Specific Condition at MCJ was Objectively Serious or was Directly Caused by any Milwaukee County Policy or Practice.

As for Lee's more specific allegations about the conditions of his confinement, each fails to raise an issue that could defeat summary judgment. As

51

set forth in his Amended Complaint, on February 17, 2022, Lee submitted a grievance complaining that fecal matter was left in standing water in a broom closet for longer than five weeks. (R. 39-12, p. 17.) Even if this is true, broom closets or other areas where supplies are kept are not considered common areas and inmates are not permitted to access those areas unless they are part of a cleaning crew. (R. 39, ¶ 55.) Thus, Lee had no reason to come into contact with anything in the broom closet and in fact was prohibited from doing so. And because this is a single incident, it fails to demonstrate any pattern or practice of unconstitutional conduct for purposes of a *Monell* claim.

Next, Lee complained that on a single occasion, he witnessed medical staff drawing blood from another inmate in close proximity to where food was being served. He conceded that he "did not see any blood forms come in contact with meals/the meal cart," but he was concerned about the incident nonetheless and later claimed that he was exposed to "hazardous biomedical material." (R. 6, p. 22, ¶ 12(d).) Even assuming that a nurse drew another inmate's blood in the general vicinity of an eating area <u>and</u> that this was unconstitutional, a single incident falls woefully short of the requirements necessary to establish a *Monell* claim. *See Thomas*, 604 F.3d at 303. His claim also fails because he cannot identify any Milwaukee County policy behind the nurse's actions or that caused him any injury. *See Wood v. Milwaukee County*, 22-3030, 2023 WL 5348344 at *2 (7th Cir. Aug.

21, 2023) (unpub.) (explaining that simply asserting that "Milwaukee County Jail was in control" of the facility is not sufficient to proceed on a *Monell* claim).

Lee then alleges that on March 14, 2022, he submitted a grievance stating that his sink was clogged with standing water for three days, "inhibiting his ability to get clean drinking water while in his cell." (R. 6, p. 11, ¶ 14.) Yet he also confirmed that he was actually able to use his sink, he just had to "manually empty [it] to prevent it from flooding." (R. 39-12, p. 22.) He further stated that he also had access to drinking water in the dayroom, and he clarified in his appeal that his alleged lack of access to drinking water was because "the water pressure in my sink is inadequate." (*Id*., pp. 22-23.) Corrections staff confirmed that a work order for his sink was submitted as soon as they were notified: on March 14, 2022. (*Id*., p. 22.) And his sink was repaired the following day: March 15, 2022. (R. 39-10, p. 3 (first line).) Lee responded that he "notified staff 2 days prior to the fulfillment of the order," meaning that he allegedly told someone about his sink on March 13, 2022. (R. 39-12, p. 23.)

The fact that Lee's sink clogged, or that it took plumbers 24-48 hours to fix it, was not done for purposes of punishment (R. 39, ¶ 49) and therefore cannot constitute an unconstitutional condition of confinement. *See Mulvania*, 850 F.3d at 856. And the Constitution "requires reasonableness, not immediacy." *Pulera*, 966 F.3d at 555. The District Court confirmed that a single instance of a clogged sink

53

simply does not rise to the level of an objectively serious deprivation. (R. 49, p. 11.) Regardless, even if this incident could rise to the level of an unconstitutional condition of confinement, it is only a single incident that fails to establish any pattern or practice for purposes of a *Monell* claim. Nor has Lee pointed to any policy or widespread practice of Milwaukee County that directly caused the incident or his alleged deprivation. Therefore, this allegation fails as a matter of law.

Lee also complains that on June 19, 2022, there were "instances" when his toilet was "disabled" and he was forced to eat, sleep, and live with urine and fecal matter "for hours at a time." (R. 6, p. 11.) Water to inmate toilets is never turned off as a punishment. (R. 39, ¶ 56.) Instead, as the response to his grievance about this incident explained, the water was turned off because other inmates were flooding their cells. (*Id*.) It is MCJ policy and practice that water is only turned off to inmate toilets and/or sinks if necessary to stop inmates' flooding their cells and so that plumbers or other maintenance workers can repair any problems. (*Id*.) It is MCJ policy and practice that if water is turned off to inmate toilets and/or sinks for these purposes, the water is only turned off for the shortest amount of time necessary to address the problem. (*Id*.) Thus, while this may have been unpleasant, it does not amount to a violation of the constitution. *See Langston Kiser*, 2022 WL 17476937, *2 (citing *Hardeman*, 933 F.3d at 824).

54

Lee's next complaint is that he reported the presence of "black mold" in the showers on July 29, 2022. (R. 6, p. 11, ¶ 14.) Plaintiff's Amended Complaint confirmed that the mold was cleaned by a biohazard team within nine days. (*Id.*) It is simply a fact of life that shower areas are prone to mold and mildew. The cleaning products used by MCJ's cleaning crews kill mold and sanitize surfaces, although they do not always remove the color of stains created by mold or mildew. (R. 39, ¶ 43; R. 39-8.) MCJ's cleaning crews strive to clean the showers once a week. (R. 39, ¶ 41.) In this instance, it took them nine days instead of seven to clean the showers in question. But even with this slight delay, this fails to rise to the level of a significantly prolonged neglect of sanitation that is required to establish a constitutional violation. *See Antonelli*, 81 F.3d at 1431; *Board*, 394 F.3d at 482. The timing of the cleaning of the showers has nothing to do with punishment of inmates, and a single complaint about mold in the showers fails to establish the requisite notice to Milwaukee County necessary to proceed on a *Monell* claim. Therefore, this claim fails.

Each of Lee's specific claims about the cleanliness of MCJ fail on three fronts: 1) he failed to produce evidence showing that the alleged conditions were serious enough to rise to the level of a constitutional violation; and 2) he failed to point to evidence showing any kind of pattern or practice of similar constitutional violations; and 3) he failed to identify any evidence connecting any of these

55

conditions to any Milwaukee County policy or practice. He once again relies on his own complaints about these issues (*see* Doc. 4, pp. 12-14), which is insufficient to support a Monell claim. *Daniel*, 833 F.3d at 734. He also cites MCJ policies and complains that they were violated. (Doc. 4, p. 12.) But again, violations of internal jail policies do not establish a constitutional violation. *Pulera*, 966 F.3d at 551.

IV.  **LEE'S OTHER ARGUMENTS MUST BE DISREGARDED BECAUSE THEY WERE NOT RAISED IN THE DISTRICT COURT AND/OR WERE SPECIFICALLY DISMISSED IN THE SCREENING ORDERS.**

Lee concludes his moving brief by alleging that he "cited instances of discretionary mass punishments" and asserting that the represent the shared experiences "of at least 48+ occupants of the same living space as the Plaintiff." (Doc. 4, pp. 13-14.) However, the District Court did not interpret the Complaint or Amended Complaint to make any such claim, let alone allow Lee to proceed on these allegations. (*See* R. 6, R. 11.) As for the contention that other inmates suffered similar constitutional deprivations, the District Court explicitly told Lee that he "may proceed only on claims involved the violation of his own rights; he may not proceed on behalf of other detainees or prisoners." (R. 5, p. 10 (citing *Lewis v. Casey*, 518 U.S. 343, 349-50 (1996) and *Massey v. Helman*, 196 F.3d 727, 739-40 (7th Cir. 1999).) And even to the extent that Lee may be complaining about MCJ's responses to his various requests and grievances, the alleged mishandling or denial of grievances "by persons who otherwise did not cause or participate in the

56

underlying conduct states no claim." *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011); *see also Grieveson v. Anderson*, 538 F.3d 763, 772 n.3 (7th Cir. 2008); *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007).

Lee also asserts at least twice that he and other inmates were subjected to mass punishment "over the span of 2 years" at the hands "of a Defendant Jail supervisory employee" as shown by allegations he made in his grievances or requests. (*See* Doc. 4, pp. 14, 17.) This is somewhat similar to broad and unsupported allegations Lee made in the District Court about years-long lockdowns.[5] Regardless, Lee's uncorroborated and unsupported allegations in a grievance or request are not objective evidence of any wrongdoing, nor do they establish any unconstitutional policy or practice—let alone a practice that spanned two years. And Lee did not name any individual defendants (or John Does) and was not permitted to proceed on claims against any particular individual Milwaukee County employee. (*See* R. 5; R. 11.) To the contrary, the District Court

---

[5] In his summary judgment materials, Lee appeared to claim that because Captain William Duckert averred in his declaration that Milwaukee County had policies and procedures in place to address COVID, this should be extrapolated to mean these COVID lockdowns were "in effect for **years**" and that Captain Duckert's failure to state as much constituted "blatantly overt" deception. (*See* R. 45, p. 13 (emphasis in original).) Absolutely nothing in Captain Duckert's declaration stated or implied that the jail employed COVID lockdowns for "years," and Lee did not submit any evidence whatsoever to support his claim. Therefore, his inflammatory assertions about deception – in addition to his claims about years of lockdowns—must be disregarded entirely.

57

specifically stated in its second Screening Order that Lee "may not proceed on a claim related to his allegations against Jail staff." (R. 11, p. 6.)

Lee did not appeal the District Court's screening orders. He only appealed the District Court's May 14, 2024, Order granting Defendant-Appellee summary judgment. (*See* Doc. 4, pp. 3-4.) Thus, to the extent that Lee raises issues in his appeal that are not within the ambit of the actionable claims identified in the District Court's screening orders, they must be disregarded because they are not properly before this Court.

## CONCLUSION

For the reasons set forth herein, Defendant-Appellee Milwaukee County respectfully requests that this Court affirm the District Court's Order granting Defendant-Appellee's Motion for Summary Judgment and dismiss this action in its entirety, with prejudice.

Respectfully submitted this 12th day of August, 2024.

<div style="text-align:right">

s/    Sara C. Mills
SAMUEL C. HALL, JR.
WI State Bar No. 1045476
SARA C. MILLS
WI State Bar No. 1029470
MICAELA E. HAGGENJOS
WI State Bar No. 1118840
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendant-Appellee,
Milwaukee County, Wisconsin
710 N. Plankinton Avenue, Suite 500
Milwaukee, Wisconsin 53203

</div>

Phone: 414-271-7722
SHall@CrivelloLaw.com
SMills@CrivelloLaw.com
MHaggenjos@CrivelloLaw.com

## CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g), FRAP RULE 32(c)

The undersigned, counsel of record for the Defendant-Appellee, furnishes the following in compliance F.R.A.P Rule 32(a)(7) and C.R. 32(c):

I hereby certify that this brief conforms to the type-volume rules contained in Fed. R. App. P. 32(a)(7) for a brief produced with a proportionally spaced 12-point (or larger) type-face font. The length of this brief is 13,568 words, excluding portions of the brief exempted by Fed. R. App. P. 32(f).

Dated this 12th day of August, 2024.

<div style="margin-left:40%">

s/ Sara C. Mills
SAMUEL C. HALL, JR.
WI State Bar No. 1045476
SARA C. MILLS
WI State Bar No. 1029470
MICAELA E. HAGGENJOS
WI State Bar No. 1118840
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendant-Appellee,
Milwaukee County, Wisconsin
710 N. Plankinton Avenue, Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
SHall@CrivelloLaw.com
SMills@CrivelloLaw.com
MHaggenjos@CrivelloLaw.com

</div>

**PROOF OF SERVICE**

Pursuant to Cir. R. 31(e), I e-filed a digital copy of the brief in searchable PDF format via the ECF System and served Plaintiff-Appellant via regular mail to the following:

Calvin Lee
ID No. 46556
Oak Hill Correctional Institution
5212 County Highway M
P.O. Box 938
Oregon, WI 53575-0938

Dated this 12th day of August, 2024.

s/     Sara C. Mills
SAMUEL C. HALL, JR.
WI State Bar No. 1045476
SARA C. MILLS
WI State Bar No. 1029470
MICAELA E. HAGGENJOS
WI State Bar No. 1118840
CRIVELLO, NICHOLS & HALL, S.C.
Attorneys for Defendant-Appellee,
Milwaukee County, Wisconsin
710 N. Plankinton Avenue, Suite 500
Milwaukee, Wisconsin 53203
Phone: 414-271-7722
SHall@CrivelloLaw.com
SMills@CrivelloLaw.com
MHaggenjos@CrivelloLaw.com

☐

# CERTIFICATE OF SERVICE
**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/_____

☑

# CERTIFICATE OF SERVICE
**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on August 12, 2024 _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:
Calvin Lee
_____
_____
_____
_____
_____
_____
_____

address:
Oak Hill Correctional Institution
ID NO. 46556
5212 County Highway M.
P.O. Box 938
Oregon, WI 53575-0938
_____
_____
_____

s/ Sara C. Mills