No. 24-1945

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| Calvin D. Lee, | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| *Plaintiff-Appellant,* | ) | District of Wisconsin |
| | ) | (Milwaukee) |
| v. | ) | |
| | ) | No. 22-cv-01089-WED |
| Milwaukee County, Wisconsin, | ) | |
| | ) | William E. Duffin |
| *Defendant-Appellee.* | ) | Magistrate Judge |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## REPLY BRIEF OF PLAINTIFF-APPELLANT CALVIN D. LEE

Maria LaBella
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000

Andrianna D. Kastanek
*Counsel of Record*
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com

*Counsel for Plaintiff-Appellant*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION .................................................................................. 1

ARGUMENT ........................................................................................ 3

I.    Summary Judgment On Mr. Lee's Excessive Lockdown Claims Was
      Improper ....................................................................................... 3

      A.    An Objective Reasonableness Standard—Not Deliberate
            Indifference—Governs Mr. Lee's Claims ................................. 3

      B.    A Factfinder Could Conclude That MCJ's Lockdowns Were
            Objectively Unreasonable. .......................................................... 4

      C.    MCJ's Practice Of Disabling Toilets Contributed To The
            Objectively Unreasonable Nature Of Its Lockdowns. ............. 11

II.   Summary Judgment On Mr. Lee's Claims Regarding Inadequate Health
      Care Was Improper. ..................................................................... 12

      A.    A Reasonable Factfinder Could Find A Pattern Of Objectively
            Unreasonable Care ...................................................................... 12

      B.    The County's Delegations To Wellpath Do Not Allow It To Avoid
            *Monell* Liability ...................................................................... 14

III.  Summary Judgment On Mr. Lee's Claims Regarding MCJ's Health And
      Sanitation Conditions Was Improper. .......................................... 17

CONCLUSION ................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir. 1985) ........................ 15

*Beal v. Beller*, 847 F.3d 897 (7th Cir. 2017) ............................................................. 4, 5

*Bell v. Dart*, 807 F. App'x 562 (7th Cir. 2020) ..................................................... 19–20

*Bell v. Wolfish*, 441 U.S. 520 (1979) ........................................................................ 8, 9

*Estate of Borroto v. CFG Health Sys., LLC*, 751 F. Supp. 3d 443 (D.N.J. 2024) ...................................................................................................................... 15

*Budd v. Motley*, 711 F.3d 840 (7th Cir. 2013) ............................................................ 18

*Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003) ................................................... 10

*Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316 (7th Cir. 1993) ............................................................................................................ 16

*Dale v. Lappin*, 376 F.3d 652 (7th Cir. 2004) .............................................................. 5

*Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988) ............................................ 7

*Delaney v. DeTella*, 256 F.3d 679 (7th Cir. 2001) ....................................................... 7

*Ford v. Wilson*, 90 F.3d 245 (7th Cir. 1996) ................................................................ 5

*Hahn v. Walsh*, 762 F.3d 617 (7th Cir. 2014) ............................................................ 16

*Hardeman v. Curran*, 933 F.3d 816 (7th Cir. 2019) ........................................ 3, 18, 20

*Hudson v. McHugh*, 148 F.3d 859 (7th Cir. 1998) ...................................................... 18

*J.K.J. v. Polk Cnty.*, 960 F.3d 367 (7th Cir. 2020) ................................................ 14, 15

*Jackson v. Duckworth*, 955 F.2d 21 (7th Cir. 1992) ............................................... 5, 12

*King v. Kramer*, 680 F.3d 1013 (7th Cir. 2012) .................................................... 15, 17

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) ...................................................... 3, 21

*Langford v. Norris*, 614 F.3d 445 (8th Cir. 2010) ..................................................... 15

ii

*Lax v. City of South Bend*, 449 F.3d 773 (7th Cir. 2006) ................................ 5

*Lewis v. Downey*, 581 F.3d 467 (7th Cir. 2009) ........................................... 7

*Mays v. Dart*, 974 F.3d 810 (7th Cir. 2020) ............................................ 8, 20

*Miranda v. Cnty. of Lake*, 900 F.3d 335 (7th Cir. 2018) ..................................... 16, 21

*Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849 (7th Cir. 2017) ................ 8–9

*Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525
(7th Cir. 2000) ........................................................................ 16

*Owens v. Hinsley*, 635 F.3d 950 (7th Cir. 2011) ......................................... 5

*Redman v. Downs*, 854 F. App'x 736 (7th Cir. 2021) .................................. 20

*Reed v. Bowen*, 769 F. App'x 365 (7th Cir. 2019) .................................. 18, 20

*Rhodes v. Chapman*, 452 U.S. 337 (1981) ............................................ 17–18

*Riker v. Lemmon*, 798 F.3d 546 (7th Cir. 2015) ........................................ 9

*Stewardson v. Titus*, 126 F.4th 1264 (7th Cir. 2025) ................................ 16

*Turley v. Rednour*, 729 F.3d 645 (7th Cir. 2013) ...................................... 7

*Wallace v. Adkins*, 115 F.3d 427 (7th Cir. 1997) ..................................... 10

*Estate of Walter ex rel. Klodnicki v. Corr. Healthcare Cos.*, 323 F. Supp.
3d 1199 (D. Colo. 2018) ................................................................ 15

*Wellman v. Faulkner*, 715 F.2d 269 (7th Cir. 1983) .................................. 14

*West v. Atkins*, 487 U.S. 42 (1988) ................................................... 15

*Whitaker v. Dempsey*, 144 F.4th 908 (7th Cir. 2025) ................................. 6

*Wilson v. Seiter*, 501 U.S. 294 (1991) ................................................ 17

## Other Authorities

CDC, CDC Respiratory Virus Guidance: *What it Means for
Correctional & Detention Facilities* (Mar. 7, 2024),
https://bja.ojp.gov/doc/cdc-virus-guidance-presentation.pdf ................................. 8

CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.in.gov/idoc/files/Management-of-COVID-19-in-Correctional-Facilities.pdf ...................................................................................... 8

# INTRODUCTION

The County's brief confirms why summary judgment cannot stand. It relies on MCJ's institutional policies and aspirational procedures, as if their existence forecloses a jury's ability to credit Mr. Lee's lived experience over the County's paperwork (it does not). It repeatedly characterizes Mr. Lee's evidence as "unsupported," while declining to engage with his sworn affidavit (converted from his *pro se* complaint) and 43-page grievance log, which this Court has long held constitute competent summary judgment evidence. And it leans on Eighth Amendment doctrine that no longer applies to pretrial detainees' conditions-of-confinement claims post-*Kingsley*. When considering *all* record evidence, construing it as Rule 56 requires, and applying the proper Fourteenth Amendment standard, a reasonable jury could find for Mr. Lee on each of his claims.

Start with lockdowns. The County insists that MCJ's lockdowns were necessary operational measures but offers no justification for confining inmates to their cells for more than 23 hours at a time, a practice that continued over seven months. Instead, the County insists that Mr. Lee's sworn descriptions of the lockdowns are overblown—effectively asking this Court to credit the County's account over Mr. Lee's. And it requests deference on the theory that MCJ's pandemic response was designed based on public health guidance, while pointing to *no* evidence that public health officials ever recommended the sort of prolonged lockdowns described in the record and without addressing whether MCJ considered alternatives to those lockdowns. On this record, a reasonable factfinder could find MCJ's actual lockdown practices excessive in relation to its stated goals.

On the healthcare claim, the County does not dispute that Mr. Lee suffered from serious, diagnosed conditions (disclosed at intake), including a traumatic brain injury and PTSD, among others, yet received *no* psychological treatment for two years. Instead, the County rests its defense on the idea that it lacked notice of deficient care—while simultaneously acknowledging it dedicated all medical decision-making to Wellpath, a framework this Court has repeatedly held brings the contractor's practices within the County's own *Monell* liability. The County, in other words, assumes responsibility if there was a practice of not providing adequate care or follow-up for serious psychological conditions, regardless of its own level of notice or fault (in comparison to its contractor). Against this backdrop, summary judgment for the County was improper.

So, too, for Mr. Lee's sanitation claims. The County characterizes the challenged conditions as minor, sporadic inconveniences, but the record—construed in the light most favorable to Mr. Lee—tells a different story. Mr. Lee's sworn statements and contemporaneous grievances describe a jail environment in which unreliable in-cell plumbing and fecal contamination were recurring issues, resulting in cells that radiated a smell of raw sewage and that provided only limited clean water access—among other issues such as molded showers and filthy living areas. The County's piecemeal rebuttal offers no answer to the combined effect of these deprivations. And it ignores the governing rule that conditions-of-confinement claims must be evaluated holistically and that pretrial detainees cannot be subjected to conditions that amount to punishment, regardless of subjective intent.

# ARGUMENT

## I. Summary Judgment On Mr. Lee's Excessive Lockdown Claims Was Improper.

### A. An Objective Reasonableness Standard—Not Deliberate Indifference—Governs Mr. Lee's Claims.

Preliminarily, the County is wrong to contend that a deliberate indifference standard governs Mr. Lee's excessive lockdown claims. *See* Resp. Br. 24. This Court held in *Hardeman* that, after *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "all Fourteenth Amendment conditions-of-confinement claims brought by pretrial detainees" are governed by an "objective standard"—not deliberate indifference. *Hardeman v. Curran*, 933 F.3d 816, 823–24 (7th Cir. 2019). As the Court explained, pretrial detainees may not be subject to the "more demanding" deliberate indifference standard that is derived from the Eighth Amendment's cruel and unusual punishment clause because—prior to conviction—they may not be punished at all. *Id.* at 824. Thus, a pretrial detainee need only show that challenged conditions are "excessive in relation" to a legitimate government purpose or are "objectively unreasonable"; no subjective intent to punish is required. *Id.* at 822, 824–25 (citing *Kingsley*, 576 U.S. at 397).[1]

Moreover, the issue for the Court is not, as the County suggests, whether *most* of the County's COVID-19 policies were reasonable. *Cf.* Resp. Br. 19–25. The County argues at length that, in general, MCJ deferred to public health officials and enacted

---

[1] Despite the County's invocation of deliberate indifference, at times it correctly frames the issue as whether the conditions were "objectively reasonable" or "excessive in relation" to public health aims. *E.g.*, Resp. Br. 24, 29, 31.

masking, testing, and other COVID-19 policies. *E.g.*, *id.* at 24–25 (listing MCJ policies and arguing that "Lee has not pointed to any evidence or case law to suggest that these precautions were not entirely reasonable and sufficient"). But Mr. Lee does not challenge every facet of MCJ's pandemic response.[2] Instead, he challenges MCJ's excessive lockdown regime (as compounded by other conditions, such as disabled cell toilets). In other words, his argument is not that MCJ failed to respond to COVID-19, but rather, that MCJ's imposition of a near-total lockdown—to the exclusion of more modest alternatives such as additional dayroom rotations—was an excessive response.

If the Court concludes that a reasonable factfinder could agree MCJ's lockdowns—during *or after* the height of the pandemic—were objectively unreasonable or excessive in relation to MCJ's public health aims, then the Court should reverse the magistrate judge's grant of summary judgment on this claim.

### B. A Factfinder Could Conclude That MCJ's Lockdowns Were Objectively Unreasonable.

Construing the record in the light most favorable to Mr. Lee, a genuine dispute exists as to whether the County's lockdowns (both pre- and post-pandemic) were unduly excessive.

Troublingly, the County asks the Court to disregard the sworn factual allegations contained in Mr. Lee's affidavit and based on his personal knowledge.[3] In

---

[2] Nor is Mr. Lee pursuing the argument on appeal that his constitutional rights were violated because he contracted COVID-19. *Cf.* Resp. Br. 19, 24.

[3] The magistrate judge converted Mr. Lee's verified complaint into a sworn affidavit. A1–2. *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017) (explaining "a verified complaint is not just a pleading; it is also the equivalent of an affidavit for purposes

particular, the County contends that "no evidence in the record" supports Mr. Lee's allegation that he was subject during the pandemic to lock-ins for 26.5-hour periods, every other day, for seven months.[4] Resp. Br. 16. But Mr. Lee's sworn allegations *are* evidence. *See, e.g.*, *Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996) (plaintiff's verified complaint containing factual allegations based on personal knowledge was competent evidence for summary judgment purposes); *Beal v. Beller*, 847 F.3d 897 (7th Cir. 2017) (similar, emphasizing "a verified complaint is not just a pleading").

The County may paint a different picture of its lockdown regime—and it has submitted MCJ's written policies and a declaration by Assistant Jail Commander William Duckert as evidence. *See* SA72–83; R.39-1, R.39-2. But "summary judgment is not a procedure for resolving a swearing contest." *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (reversing summary judgment for defendants based on plaintiff's affidavit describing inhumane conditions of confinement, notwithstanding defendants' sworn denials of those conditions).[5] To the extent Mr. Lee and the County

---

of summary judgment, because it 'contains factual allegations that if included in an affidavit or deposition would be considered evidence, and not merely assertion'" (quoting *Ford v. Wilson*, 90 F.3d 245, 246 (7th Cir. 1996)); *Owens v. Hinsley*, 635 F.3d 950, 954–55 (7th Cir. 2011) (explaining that plaintiff's sworn declaration was "equivalent to an affidavit for purposes of summary judgment" and collecting cases).

[4] The seven-month period was from December 16, 2020, until late July 2021. SA9 ("From December 16th, 2020 until late July, 2021, the Milwaukee County Jail and Milwaukee County's Sheriff Department had the consistent practice of confining the Plaintiff (and one half of its residents) to his cell for 26.5 hours, per day, every other day in alternating patterns."). SA9–10.

[5] *See also, e.g.*, *Lax v. City of South Bend*, 449 F.3d 773, 774 (7th Cir. 2006) (inmate-plaintiff's affidavit, albeit somewhat "vague," sufficed to create genuine dispute of material fact; reversing grant of summary judgment in part); *Dale v. Lappin*, 376 F.3d 652, 655–56 (7th Cir. 2004) (similar; inmate-plaintiff's allegations—based on his

offer differing accounts of the duration or frequency of MCJ's lockdowns, a factfinder—not the Court—should determine which account is more credible. *See Whitaker v. Dempsey*, 144 F.4th 908, 917 (7th Cir. 2025) ("We have reversed district courts time and again for relying on one party's version of disputed facts to grant summary judgment.").

In any event, none of the County's cited evidence actually refutes Mr. Lee's description of the lockdowns. Mr. Duckert, for example, admitted that "[o]ccasionally, some inmates were confined to their cells for more than 23 hours in a 24-hour period" but includes no further detail (SA82 ¶ 57)—nor did the County provide any data on inmate lockdowns. By contrast, Mr. Lee specifically attested that "[f]rom December 16th, 2020 until late July, 2021, the Milwaukee County Jail and Milwaukee County's Sheriff Department had the consistent practice of confining the Plaintiff (and one half of its residents) to his cell for 26.5 hours, per day, every other day in alternating patterns." SA9–10.[6] And Mr. Lee documented at least eight additional lockdowns that occurred after July 2021—each of which lasted for more than 23 hours, and some of which lasted for more than 44 hours. *See* Op. Br. 5–6 (collecting examples).

On Mr. Lee's account, a reasonable factfinder could conclude that the County's lockdowns—both during and after the height of the pandemic—crossed the line from reasonable health precautions to excessive restraints on inmate liberty. Indeed,

---

personal knowledge and converted into affidavit—sufficed to create genuine fact dispute; rejecting argument that such allegations were merely "bald assertions").

[6] The magistrate judge correctly interpreted this to mean that "[MCJ's] policy created periods where prisoners remained in their cell for 26.5 hour periods." A3.

federal appellate courts (including this Court) have recognized the viability of Eighth Amendment claims on similar facts—and the Eighth Amendment imposes a *more* demanding standard than the Fourteenth Amendment, which governs Mr. Lee's pretrial detention claims. *See* Op. Br. 23–26 (collecting cases).

In *Delaney v. DeTella*, for example, a prisoner's allegation that he was subjected to a six-month, near-total lockdown raised a triable issue on his Eighth Amendment claim. 256 F.3d 679, 681–84, 687 (7th Cir. 2001). In *Turley v. Rednour*, a prisoner's allegation that he was locked down for more than 50% of the time during a 33-month period stated a viable Eighth Amendment claim. 729 F.3d 645, 652–53 (7th Cir. 2013). And in *Davenport v. DeRobertis*, which involved allegations that maximum-security-risk prisoners were confined for 3+ consecutive months, this Court upheld an injunction requiring the prison to provide "at least five hours of exercise time per week in order to comply with the Eighth Amendment." 844 F.2d 1310, 1315–17 (7th Cir. 1988). If each of these circumstances raised serious constitutional questions under the Eighth Amendment, then MCJ's seven months of 26.5-hour rotating lockdowns raise a triable issue under the Fourteenth Amendment's "higher standard of protection." *Lewis v. Downey*, 581 F.3d 467, 473–74 (7th Cir. 2009) (quotations and alterations omitted).

The County retorts that MCJ administrators were entitled to "wide-ranging deference" in responding to the pandemic, and the lockdowns were based on "guidance and direction from trained medical professionals." Resp. Br. 20–21. To be clear, the County points to no evidence that public health officials actually

recommended confining inmates to their cells for 23+ hour periods for months. It cites only to general representations by Mr. Duckert that "MCJ enacted … procedures to minimize the risk of contracting or spreading Covid-19 based on guidance and direction" from experts. SA73–74; *see also* SA83 (similar).

The County's inability to point to specific guidance is not surprising. It strains credulity that public health experts would recommend near-total cell confinement in lieu of obvious alternatives like rotating access to common areas in smaller groups and/or layered prevention strategies (masking, testing, social-distancing).[7] But in any case, the deference owed to MCJ administrators—even when (purportedly) relying on public health guidance—is not unbounded. *Cf. Mays v. Dart*, 974 F.3d 810, 823 (7th Cir. 2020) ("The CDC Guidelines—like other administrative guidance—do not themselves set a constitutional standard."); *Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) (noting that recommendations of a Department of Justice task force "regarding conditions of confinement for pretrial detainees are not determinative of the requirements of the Constitution"). Jail administrators must always provide more than "meagre justification"—even for policies (purportedly) based on public health guidance or institutional safety. *Cf. Mulvania v. Sheriff of Rock Island Cnty.*, 850

---

[7] *See generally* CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, 10–11 (Mar. 23, 2020), https://www.in.gov/idoc/files/Management-of-COVID-19-in-Correctional-Facilities.pdf (recommending "stagger[ed] time in recreation spaces" among other precautions, no mention of increased cell confinement as prevention strategy); CDC, CDC Respiratory Virus Guidance: *What it Means for Correctional & Detention Facilities* (Mar. 7, 2024), https://bja.ojp.gov/doc/cdc-virus-guidance-presentation.pdf (specifically cautioning that "[p]hysical distancing does *not* need to mean a total lock-down") (emphasis added).

F.3d 849, 856, 858 (7th Cir. 2017) (reversing summary judgment for defendants on inmates' Fourteenth Amendment claim; concluding that even if the challenged policy—designed to promote institutional safety—was "rationally related to a legitimate interest, the dignitary harm [it] imposed … might still be excessive in relation to that interest").

Here, a reasonable jury could conclude that MCJ failed to justify its extended lockdowns. As Mr. Lee explained in his opening brief, the County's failure to explain whether it considered obvious alternatives (such as more frequent dayroom rotations, inmate transfers, or increased use of other facility space) is telling. Op. Br. 20–21; *see Riker v. Lemmon*, 798 F.3d 546, 557 (7th Cir. 2015) ("[T]he existence of obvious, easy alternatives may be evidence that the [prison] regulation is not reasonable.") (quoting *Turner v. Safley*, 482 U.S. 78, 90 (1987)). And on appeal, the County still provides no explanation. Instead, it says that that *Mr. Lee* was required, but failed, to produce evidence demonstrating that specific alternatives were feasible. Resp. Br. 20. That was not his burden. Mr. Lee's identification of obvious alternatives—and the County's failure to explain whether or why it rejected any of those (or other) alternatives— could lead a reasonable factfinder to conclude the County's approach was unreasonable. *Cf. Riker*, 798 F.3d at 557–58 (defendants' lack of testimony as to why obvious alternatives to prison's regulation "would not fully satisfy their security concerns" precluded summary judgment; Court would not "accept at face value [defendants'] unsubstantiated contentions" as to the necessity of the regulation); *Bell*, 441 U.S. at 539 (detainees may not be subject to "arbitrary" policy choices).

As to the County's post-July 2021 lockdowns—*i.e.*, the 23- to more than 44-hour lockdowns following the seven-month period of rotating 26.5-hour cell-ins—its justifications are even more spurious. *See* Op. Br. 5–6 (identifying at least eight additional lockdowns); 21–22 (same). The County cites MCJ's responses to Mr. Lee's grievances, in which MCJ staff responded that "more [out-of-cell] time is allotted when feasible," and "[t]his is in no way a form of punishment or discipline," among other assurances. Resp. Br. 21-24 (citations omitted). But these assurances, however well-intentioned, have no bearing on the actual conditions in which Mr. Lee and his fellow inmates lived. *Cf. Wallace v. Adkins*, 115 F.3d 427, 428 (7th Cir. 1997) (refusing to credit prison staff's empty assurances that they would protect inmate); *Cavalieri v. Shepard*, 321 F.3d 616, 621–22 (7th Cir. 2003) (similar). Mr. Lee averred that he and his fellow inmates were locked down *en masse* for periods of up to "44[+] h[ou]rs" without apparent justification—conditions that a factfinder could deem "objectively unreasonable." SA10–11, SA13; SA85; SA113–15, SA120, SA129–31, SA133–35, SA144–45. While the County suggests that (at least some of) these lockdowns were due to COVID-19 influxes, flooding in "various parts of the jail," or other unspecified "unforeseen situations," Resp. Br. 21–24 (citations omitted), it has provided no detail as to why these circumstances justified lockdowns of such excessive length and has not explained why entire cell blocks were locked down for 23+ hours. Nor has it addressed lesser alternatives, like confining only the inmates involved in the

incidents. On this record, a factfinder could deem MCJ's lockdowns "objectively unreasonable."[8]

The County also argues that Mr. Lee's evidence of taunting by individual staff members during the lockdowns is "irrelevant" because Mr. Lee does not proceed on claims against individual officers. Resp. Br. 23 (referring to incidents where staff told Mr. Lee and his fellow inmates they were "'not coming out' for '3 days' & that they wouldn't be fed during their confinement." (citation omitted)). Not so. These incidents shed light on the conditions of confinement at MCJ, wholly apart from issues of individual officer liability.

### C. MCJ's Practice Of Disabling Toilets Contributed To The Objectively Unreasonable Nature Of Its Lockdowns.

MCJ's lockdowns were exacerbated by MCJ's practice of disabling inmate toilets. *See* Op. Br. 5–6, 10–11, 22, 43; R.45 at 16; SA94 ¶ 53, SA102 ¶ 98; SA11 ¶ 13, SA48, SA103–04, SA129, SA133–34. The County argues "the record does not contain *any* evidence" that the jail had a policy of "disabling [] plumbing to in-cell toilets during lockdowns," citing Mr. Duckert's declaration. Resp. Br. 26 (citing SA82 ¶ 56). But the issue is not whether MCJ had a policy of disabling inmate toilets during all lockdowns as a matter of course; it is whether, as Mr. Lee has averred and documented, MCJ in fact had a practice of disabling Mr. Lee's and other inmates' toilets—sometimes *for days*—because inmates in other parts of the facility flooded

---

[8] The County does not contest Mr. Lee's argument that this Court should remand for the district court to analyze in the first instance whether the post-July 2021 lockdowns raised a genuine issue of material fact.

their cells. *See* R.45 at 16; SA94 ¶ 53, SA102 ¶ 98; SA11 ¶ 13, SA48, SA103–04, SA129, SA133–34.

The County does not dispute that Mr. Lee's and other inmates' toilets were disabled—including for multi-day periods—due to other inmates' conduct. *See* Resp. Br. 26–28. Instead, it claims that MCJ turned off water only for the "shortest amount of time necessary" for repairs. *See id.* But again, "summary judgment is not a procedure for resolving a swearing contest." *Jackson*, 955 F.2d at 22. While the County may assert that it narrowly tailored its actions as needed to address inmate flooding, Mr. Lee's experience indicates otherwise: he and his fellow inmates were forced to live in close quarters with their own waste for up to a "week+" based solely on other inmates' actions. SA133. Viewing the record in the light most favorable to Mr. Lee, then, there are genuine factual questions regarding the scope of MCJ's practice of disabling toilets and whether those practices were "objectively unreasonable."

## II.    Summary Judgment On Mr. Lee's Claims Regarding Inadequate Health Care Was Improper.

### A.    A Reasonable Factfinder Could Find A Pattern Of Objectively Unreasonable Care.

The County does not (and cannot) dispute that Mr. Lee received no mental health treatment for two years, despite his repeated pleas. Op. Br. 36. Nor does it dispute that, upon entry to MCJ, Mr. Lee informed personnel that he suffered from, and was being treated for, serious psychological conditions including a traumatic brain injury, post-traumatic stress disorder, anxiety/depression, blackouts, and other combat-related conditions. *Id.* at 6–7. The County nonetheless claims that Mr. Lee

did not receive deficient care because no provider "determined that [Mr.] Lee needed long-term therapy or any other service for that matter." Resp. Br. 32.

Of course, no provider could determine whether Mr. Lee required long-term therapy or other specific mental health treatment because, it appears, no provider *saw* Mr. Lee. *See* SA12, SA14, SA107, SA114, SA136. And, as discussed below, the County cannot avoid liability by deferring inmate care decisions to Wellpath, then arguing, due to such deference, it had no notice of unmet health needs.

The County also reviews (some of) Mr. Lee's health-related grievances and argues that none indicated inadequate treatment. Resp. Br. 32–37. But the County does not claim that MCJ (or Wellpath) actually facilitated care in response to his repeated requests. Nor could it: MCJ informed Mr. Lee that "all volunteer services ha[ve] been cancelled," SA114, and "[l]ong term therapy is not provided," SA107. It directed Mr. Lee to fill out sick-call slips—which he had already done "multiple times" to no avail (hence his resort to grievances). SA11–12 ¶ 15; *see also* SA107, SA113–14. And when Mr. Lee filed a grievance asserting his "legal right to access to adequate treatment" and explaining that "none ha[d been] provided in 18 months," MCJ closed it out—a response that the County does not defend on appeal. SA136.

In any event, whether MCJ's response to any particular grievance was objectively unreasonable is ultimately beside the point. In picking apart Mr. Lee's grievances one-by-one, the County misses the forest for the trees. It is undisputed that, over the course of two years, Mr. Lee filled out numerous grievances and white slips—and ultimately, resorted to a hunger strike—seeking care for his serious,

diagnosed mental health conditions. And there is no evidence that MCJ (or Wellpath) provided *any*. On this record, a reasonable factfinder could discern a pattern of "objectively unreasonable" care. *Cf. Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (prison's medical care constitutionally deficient where staff psychiatrist position remained vacant for two years, leaving inmates with unreliable access to mental health treatment during that time); *see also* Op. Br. 32–34 (collecting cases recognizing constitutionally deficient care under analogous circumstances).

## B. The County's Delegations To Wellpath Do Not Allow It To Avoid *Monell* Liability.

The County further argues that summary judgment was warranted because it lacked notice that Wellpath provided deficient care. Resp. Br. 38. Specifically, it argues "the standard for *Monell* claims **always** requires evidence of notice." *Id.* And here, the County claims, MCJ could not have had notice because it defers to Wellpath "for all inmate health care decisions"—including by re-routing health-related grievances and slips to Wellpath. *Id.* at 41.

At the outset, the County confuses the notice issue. It is true that, in general, a county's inaction does not give rise to *Monell* liability if the County lacked notice of a "'known or obvious' risk" that constitutional violations would occur. *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 379–80 (7th Cir. 2020) (citation omitted). But where, as here, a county defers to a third-party contractor, it "steps into the shoes" of the contractor for purposes of *Monell* liability; the County does not itself need to be on notice of the

violation(s).[9] Thus, if the contractor would meet the criteria for *Monell* liability, liability is imputed to the county. *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012). Were it otherwise, municipalities could avoid accountability for unconstitutional detention conditions simply by outsourcing to private contractors. *Cf. West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody[.]").

None of the County's cases suggest otherwise. Some recite the general principle that *Monell* defendants must be on notice to be liable—but did not involve contractor delegation and therefore are not in tension with the rule that counties step into the shoes of contractors they engage. *See, e.g.*, *J.K.J.*, 960 F.3d at 379 (addressing County's training of staff on sexual abuse prevention, not contractor delegation);

---

[9] *See, e.g.*, *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("[T]he private company's policy becomes that of the County if the County delegates final decision-making authority to it."); *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985) ("Although Prison Health Services has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the Health Service."); *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) ("[W]here the duty to furnish treatment is unfulfilled, the mere contracting of services with an independent contractor does not immunize the State from liability for damages in failing to provide a prisoner with the opportunity for such treatment." (citation omitted)); *Estate of Borroto v. CFG Health Sys., LLC*, 751 F. Supp. 3d 443, 473 (D.N.J. 2024) ("Just as a private contractor can be liable under § 1983 for constitutional violations, so too a municipality can be liable for their chosen contractor's unconstitutional customs and practices."); *Estate of Walter ex rel. Klodnicki v. Corr. Healthcare Cos.*, 323 F. Supp. 3d 1199, 1216 (D. Colo. 2018) ("[T]he question is not whether the County itself promulgated an unconstitutional policy or had notice of problems caused by [the contractor]'s policy, but whether [the contractor] had an unconstitutional policy and otherwise satisfies the *Monell* requirements. If it does, the County can be liable[.]").

*Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000) (similar).[10] Others indicate that a finding of "deliberate indifference" based on a municipal defendant's own inaction or failure to train requires the defendants to have notice of the risk of a constitutional violation. *See, e.g.*, *Hahn v. Walsh*, 762 F.3d 617, 637 (7th Cir. 2014); *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993).[11] But deliberate indifference is not the standard here.[12]

The County claims that holding it liable for Wellpath's failures without evidence it was on notice of Wellpath's deficient care "'risk[s] creating *de facto respondeat superior* liability.'" Resp. Br. 39 (quoting *Cornfield*, 991 F.2d at 1327). But this language from *Cornfield* is from the context of a government being held accountable for the actions of an *employee*. *See Cornfield*, 991 F.2d at 1327. The point does not apply where the liability is instead based on the government's relationship with a private contractor. In the private contractor setting, as this Court explained

---

[10] The County also cites *Stewardson v. Titus*, 126 F.4th 1264, 1279–80 (7th Cir. 2025). But *Stewardson*, too, did not involve any delegation to a contractor. The Court affirmed summary judgment for the county sheriff on the grounds that the plaintiff identified only a single incident, not a municipal policy or practice. *Id.* There was no discussion of *Monell* notice requirements.

[11] Moreover, as relevant here, the issue in *Hahn* was whether *the sheriff* was deliberately indifferent by not instituting certain emergency policies for diabetic detainees whose blood sugar was not being measured and who refused to eat. 762 F.3d at 636. This Court affirmed summary judgment for the sheriff because there was no evidence (such as prior incidents or complaints) that the sheriff was on notice that not having such policies could cause death or serious harm. *Id.* at 636–38. Without such notice, the Court held, it "c[ould] [not] infer that the lack of a policy [wa]s the result of deliberate indifference[.]" *Id.* at 637.

[12] *See Miranda v. Cnty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) ("We thus conclude, along with the Ninth and Second Circuits, that medical-care claims brought by pretrial detainees under the Fourteenth Amendment are subject only to the objective unreasonableness inquiry identified in *Kingsley*.").

in *Kramer*, the "underlying rationale" for the principle that a county cannot disclaim liability by contracting out its duty to provide medical services is "*not* based on *responde[a]t superior*, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it." 680 F.3d at 1020 (emphasis added).

Thus, the issue for the Court is whether a reasonable factfinder could identify healthcare policies or practices (rather than isolated events) that were "objectively unreasonable"—regardless of whether they were most directly attributable to MCJ or to Wellpath. For the reasons stated in Part II.A above and in Mr. Lee's opening brief—namely, that Mr. Lee, a pretrial detainee with multiple serious, diagnosed psychological conditions was deprived of mental health treatment for two years despite repeated pleas—a reasonable factfinder *could* make that determination.

## III. Summary Judgment On Mr. Lee's Claims Regarding MCJ's Health And Sanitation Conditions Was Improper.

A reasonable factfinder could likewise determine that MCJ's health and sanitation conditions failed to pass constitutional muster.

The County attempts to downplay each of Mr. Lee's allegations regarding MCJ's health and sanitation by isolating them one-by-one. *See* Resp. Br. 42–47. In so doing, it ignores a fundamental principle of Fourteenth Amendment analysis: courts assess the totality of conditions of confinement, not each issue in a vacuum. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991); Op. Br. 37–39. Even if a single deficiency might be viewed as a tolerable inconvenience, the combination of multiple deprivations can create an unconstitutional situation. *See Rhodes v. Chapman*, 452

U.S. 337, 347 (1981) (conditions "alone or in combination[] may deprive inmates the minimal civilized measure of life's necessities"). This Court should therefore reject the County's piecemeal approach and, instead, assess whether—when viewed holistically and in the light most favorable to Mr. Lee—a reasonable factfinder could deem MCJ's conditions of confinement constitutionally deficient.

Viewed under the proper standard, the County does not refute Mr. Lee's showing that similar conditions to those at issue here have implicated the Fourteenth Amendment. *See* Op. Br. 40–44. In *Budd v. Motley*, for example, the mutually reinforcing effects of crowded cells, mold, weak ventilation, and cell sinks without running water stated a viable Fourteenth Amendment claim. 711 F.3d 840, 842 (7th Cir. 2013). In *Hardeman*, a three-day period where jail officials shut off cell water— resulting in limited access to clean drinking water and feces build-up, which in turn attracted insects—posed "objectively unreasonable conditions for pretrial detainees" in violation of the Fourteenth Amendment. 933 F.3d at 819–24. And in *Reed v. Bowen*, this Court vacated in part a grant of summary judgment where the detainee-plaintiff was confined to his triple-bunked cell for all but four hours each day, and the cell was unclean because, among other reasons, the jail-provided cleaning products were diluted and ineffective. 769 F. App'x 365, 368–70 (7th Cir. 2019).

Mr. Lee is similarly situated to these plaintiffs. Viewing the record "liberally,"[13] he, too, was forced to live alongside his own waste—at one point for a "week+"—due to disabled toilets, SA133; his cell "radiated a smell of raw sewage,"

---

[13] *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998).

SA129; he had limited access to clean drinking water because his sink was broken (for at least three days), SA128–29, SA11 ¶14; he showered in mold, as showers were "rarely properly sanitized," *Id.*; and the facility was filthy, including because the cleaning supply storage area was contaminated with fecal matter (for over five weeks), SA123—among other issues, *see* Op. Br. 9–12 (summarizing conditions).

Still, the County attempts to trivialize these (and other) conditions by asking this Court to draw inferences in *the County's* favor. It argues, for example, that "Lee had no reason to come into contact with anything" in the supply closet because he was not an inmate cleaning crew worker. Resp. Br. 48. But the inference for *Mr. Lee*—required at summary judgment—is that because the cleaning supplies were contaminated with fecal matter for five weeks, those contaminants would have spread throughout the facility when supplies were used. And MCJ repeatedly "ignored" this issue. SA123. As another example, the County argues that Mr. Lee had consistent access to clean drinking water because Mr. Lee acknowledged that he could "manually empty [his sink] to prevent it from flooding" and there was water in the dayroom. Resp. Br. 49 (citing SA128–29). But drawing the inferences for Mr. Lee, he lacked consistent access to clean drinking water because the dayroom was inaccessible during lock-ins, the cell sink could not always be emptied or cleaned (for example, because the toilet was also clogged, and cleaning supplies were often unavailable), the water pressure was inadequate, and "multiple requests" to remedy this situation were ignored. *See* SA128–29, SA11 ¶ 14. *Cf. Bell v. Dart*, 807 F. App'x

562, 564 (7th Cir. 2020) (faulting district court for drawing inferences in defendants' favor regarding detainee's access to water).

Moreover, in arguing that MCJ's conditions were insufficiently serious, the County relies almost exclusively on cases brought under the Eighth Amendment. *See* Resp. Br. 43–45. But the Eighth Amendment imposes a higher bar for conditions-of-confinement claims. *See Hardeman*, 933 F.3d at 824 (contrasting the "more demanding Eighth Amendment deliberate-indifference standard" with the Fourteenth Amendment's "objective inquiry"); *Mays*, 974 F.3d at 819 & n.1 (similar); *Redman v. Downs*, 854 F. App'x 736, 738 (7th Cir. 2021) (similar). As this Court explained in *Reed*, "[a] *detainee's* claim differs from a *prisoner's* because 'pretrial detainees (unlike convicted prisoners) cannot be punished at all.'" 769 F. App'x at 369 (citation omitted). The Eighth Amendment is thus "more permissive; it requires only that conditions not cause an 'unquestioned and serious deprivation of basic human needs ... [or] deprive inmates of the minimal civilized measure of life's necessities.'" *Id.* (quoting *Rhodes*, 452 U.S. at 347). Indeed, "restrictive and even harsh' conditions are 'part of the penalty that criminal offenders pay for their offenses.'" *Id.* (citation omitted). By contrast, "a pretrial detainee can prevail [under the Fourteenth Amendment] by showing that the [conditions] are not rationally related to a legitimate nonpunitive governmental purpose' or … 'appear excessive in relation to that purpose." *Id.* (cleaned up) (quoting *Kingsley*, 576 U.S. at 398).

This Court should therefore reject the County's efforts to discount the severity of MCJ's conditions based on cases identifying no Eighth Amendment violation. *Cf.*

*Miranda*, 900 F.3d at 352 (noting "the Supreme Court has been signaling that Courts must pay careful attention to the different status of pretrial detainees"). For the reasons above and stated in Mr. Lee's opening brief, a reasonable factfinder could determine that MCJ's unsanitary conditions—as recounted by Mr. Lee—were serious and sustained enough to fail *Kingsley*'s objective test. 576 U.S. at 398.

## CONCLUSION

For the reasons stated above and in his opening brief, Plaintiff-Appellant Calvin D. Lee respectfully requests that this Court reverse the magistrate judge's grant of summary judgment and remand the case for further proceedings.

Dated: December 17, 2025

Respectfully submitted,

JENNER & BLOCK LLP

By /s/ Andrianna D. Kastanek
    One of His Attorneys

Maria LaBella
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20001
(202) 639-6000
mlabella@jenner.com

Andrianna D. Kastanek
  *Counsel of Record*
JENNER & BLOCK LLP
353 North Clark Street
Chicago, IL 60654
(312) 222-9350
akastanek@jenner.com

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(c) because, according to the word count function of Microsoft Office Word 365, this brief contains 5,799, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and Circuit Rule 32 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in 12 point Century Schoolbook for the main text and 12 point Century Schoolbook footnotes.

Dated: December 17, 2025

/s/ Andrianna D. Kastanek
Andrianna D. Kastanek

## CERTIFICATE OF SERVICE

I, Andrianna D. Kastanek, an attorney, hereby certify that on December 17, 2025, I caused the **Reply Brief of Plaintiff-Appellant Calvin D. Lee** to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Pursuant to ECF procedure (h)(2) and Circuit Rule 31(b), and upon notice of this Court's acceptance of the electronic brief for filing, I certify that I will cause 10 copies of the above-named brief to be transmitted to the Court via hand delivery within five days of that date.

/s/ Andrianna D. Kastanek
Andrianna D. Kastanek